In re: Citibank August 11, 2020

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term, 2021

(Argued: September 29, 2021       Decided: September 8, 2022)

Docket No. 21-487

_____

CITIBANK, N.A.,

*Plaintiff-Appellant,*

v.

BRIGADE CAPITAL MANAGEMENT, LP, HPS INVESTMENT PARTNERS, LLC, SYMPHONY ASSET MANAGEMENT LLC, BARDIN HILL LOAN MANAGEMENT LLC, GREYWOLF LOAN MANAGEMENT LP, ZAIS GROUP LLC, ALLSTATE INVESTMENT MANAGEMENT COMPANY, MEDALIST PARTNERS CORPORATE FINANCE LLC, TALL TREE INVESTMENT MANAGEMENT LLC, NEW GENERATION ADVISORS LLC,

*Defendant-Appellees,*

INVESTCORP CREDIT MANAGEMENT US LLC, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS LP,

*Defendants.*

_____

Before:     LEVAL, SACK, and PARK, *Circuit Judges.*

Plaintiff Citibank, N.A, the Administrative Agent for the lenders on a $1.8 billion seven-year syndicated loan to Revlon Inc., appeals from the judgment of the United States District Court for the Southern District of New York (Jesse M. Furman, *J.*) in favor of Defendants, the Loan Managers for certain lenders, who received and refused to return Citibank's accidental, unintended early repayment of the loan. The district court, after a bench trial, relying on *Banque Worms v. BankAmerica International,* 570 N.E.2d 189 (N.Y. 1991), ruled that the rule of discharge-for-value provided a defense against Citibank's suit for restitution. Held, because the Defendants had notice of the mistake and because the lenders were not entitled to repayment at the time, the rule of *Banque Worms* does not protect the Defendants. The judgment is VACATED and the case is REMANDED to the district court.

Judge Park concurs in a separate opinion.

NEAL KUMAR KATYAL (Sean Marotta, Reedy C. Swanson, Erin Chapman, Nathaniel A.G. Zelinsky, Hogan Lovells US LLP, Washington D.C.; Nicole A. Saharsky, Mayer Brown LLP, Washington D.C.; Matthew D. Ingber, Christopher J. Houpt, Mayer Brown LLP, New York, N.Y., *on the brief*), Hogan Lovells US LLP, Washington, D.C., *for Plaintiff-Appellant*.

KATHLEEN M. SULLIVAN (Adam M. Abensohn, David M. Cooper, Benjamin I. Finestone, Robert S. Loigman, Quinn Emmanuel Urquhart

& Sullivan, LLP, New York, N.Y., *on the brief*), Quinn Emmanuel Urquhart & Sullivan, LLP, Los Angeles, CA, *for Defendant-Appellees*.

LEVAL, *Circuit Judge*:

This case raises the question whether, under New York law, the recipients of an accidental, unintended payment of approximately $500 million were required, under the circumstances, to return the payment. Citibank N.A. is the Plaintiff-Appellant. Citibank served as Administrative Agent for the lenders of a $1.8 billion syndicated seven-year loan to Revlon, Inc. ("the Loan" or "the Debt"), with responsibility to collect interest and principal payments from Revlon and transmit them to the Loan Managers for the lenders. Citibank appeals from the judgment of the United States District Court for the Southern District of New York (Jesse M. Furman, *J*.) in favor of the Defendant-Appellees,[1] who were Loan Managers for lenders of the majority of the loan.

---

[1] Defendant-Appellees are Brigade Capital Management, LP ("Brigade"), HPS Investment Partners, LLC ("HPS"), Symphony Asset Management LLC ("Symphony"), Bardin Hill Loan Management LLC ("Bardin Hill"),

In undertaking to transmit accrued interest to the lenders' Loan Managers, Citibank had made a ministerial error in administering a computer program, which caused the unwitting transfer by wire of Citibank's funds in the full amount of Revlon's outstanding principal balance, three years before Revlon's loan repayment was due, and, at a time when, because Revlon was understood to be deeply insolvent, loan participations were trading at 20% to 30% of the face amount. The next day, when Citibank discovered that the accidental transmission had occurred, it demanded the return of the portion representing principal. Upon the Defendants' refusal, Citibank brought this action for restitution.

Based on a ruling of the New York Court of Appeals in *Banque Worms v. BankAmerica International,* 570 N.E.2d 189 (N.Y. 1991), the district court decided that Defendants were not obligated to return the money. *In*

Greywolf Loan Management LP ("Greywolf"), ZAIS Group LLC ("ZAIS"), Allstate Investment Management Company ("Allstate"), Medalist Partners Corporate Finance LLC ("Medalist"), Tall Tree Investment Management LLC ("Tall Tree"), and New Generation Advisors LLC ("New Generation").

*re Citibank August 11, 2020 Wire Transfers*, 520 F. Supp. 3d 390 (S.D.N.Y. 2021). In *Banque Worm*s, the Court of Appeals had ruled in favor of a lender's right to retain a bank's mistaken repayment of a loan to the bank's client that was due and payable. *Id*. at 190-91. The Court of Appeals had explained that its ruling was based on the American Law Institute's "discharge-for-value" rule, published at Section 14 of the RESTATEMENT (FIRST) OF RESTITUTION (Am. Law Inst. 1937) ("First Restatement"). The rule of Section 14 specified circumstances that excuse the recipient of a payment made in discharge of a debt pursuant to a mistake of the payor as to his rights or duties from the customary obligation to return mistaken payments.

We conclude that that this case does not fall within the scope of the New York Court of Appeals's *Banque Worms* ruling. We accordingly VACATE the judgment of the district court and REMAND this case to the district court for further proceedings consistent with this opinion.

# BACKGROUND

The great majority of the complex facts are not in dispute. This recitation of the facts is largely taken, nearly verbatim, from Judge Furman's clear, fastidious, and scholarly exposition.[2]

## A. The 2016 Loan

In 2016, pursuant to a credit agreement, Revlon took out the seven-year, $1.8 billion syndicated, collateralized Loan. *In re Citibank*, 520 F. Supp. 3d at 397.

Citibank serves as the Administrative Agent for the lenders in administering the Loan. Its duties, set forth in the Amended Loan Agreement ("the Agreement"), included receipt of payments of principal and interest from Revlon to be transmitted to the lenders (the "Debtholders" or "Lenders"). Agreement, § 2.8.

The Defendants are Loan Managers for those Debtholders that refused to return the mistakenly transmitted funds. The outstanding

---

[2] The few changes made are not intended to alter the substance of Judge Furman's findings.

principal and accrued interest on these Debtholders' loans was $558,558,375.74 on August 11, 2020, the date of Citibank's mistaken payment. *In re Citibank*, 520 F. Supp. 3d at 398.

The Loan was not payable for three more years – until September 7, 2023 (seven years after the closing date). That maturity date was subject to acceleration if any notes representing an unsecured senior debt (a set of notes due in early 2021 – the "2021 Notes") remained outstanding on November 16, 2020, in which case the Loan would also mature on November 16, 2020.[3] *Id*.

Several provisions of the Agreement are pertinent. First, the Agreement provides that it is to be "governed by, and construed and interpreted in accordance with, the laws of the state of New York." Agreement, § 10.11 (capitalization and emphasis omitted). Second, to the extent relevant here, it defines the "Interest Payment Date" — that is, a date on which an interest payment is due — as either "the last day of"

---

[3] Other preconditions were also necessary before the Accelerated Maturity Date could take effect. Agreement, § 1.1.

each "Interest Period" or "the date of any repayment or prepayment."

Agreement, § 1.1. Finally, under Section 2.11(a), entitled "Optional Prepayments," Revlon was permitted to prepay any part of the Debt "upon irrevocable written notice delivered to [Citibank] . . . three Business Days prior thereto." Agreement, § 2.11(a). Upon receipt of any such notice Citibank was required to "promptly notify each relevant Lender thereof." Id. [4] The Agreement does not define the term

---

[4] The full text of the prepayment provision is as follows:

> The Borrower may at any time and from time to time prepay any Tranche of Revolving Loans, the Swingline Loans or any Tranche of Term Loans, in whole or in part, without premium or penalty except as specifically provided in Section 2.11(b), upon irrevocable written notice delivered to the Administrative Agent no later than 12:00 Noon, New York City time, (i) three Business Days prior thereto, in the case of Eurocurrency Loans that are Revolving Loans, Swingline Loans or Term Loans, (ii) one Business Day prior thereto, in the case of ABR Loans that are Term Loans and (iii) on the date of prepayment, in the case of ABR Loans that are Revolving Loans or Swingline Loans, which notice shall specify (x) the date and amount of prepayment, (y) whether the prepayment is of a Tranche of Revolving Loans or Swingline Loans or a Tranche of Term Loans and (z) whether the prepayment is of Eurocurrency Loans or ABR Loans; provided, that if a Eurocurrency Loan is prepaid on any day other than the

8

"promptly."

**B. The May 2020 Transaction and UMB Bank Litigation**

In the spring of 2020, Revlon's "liquidity position" was "extremely

---

last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to Section 2.21. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof. If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein (provided, that any such notice may state that such notice is conditioned upon the occurrence or non-occurrence of any transaction or the receipt of proceeds to be used for such payment, in each case specified therein (including the effectiveness of other credit facilities), in which case such notice may be revoked by the Borrower (by written notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied), together with (except in the case of Revolving Loans that are ABR Loans) accrued interest to such date on the amount prepaid. Partial prepayments of Term Loans, Revolving Loans or Swingline Loans shall be in an aggregate principal amount of (i) $1,000,000 or a whole multiple of $100,000 in excess thereof (in the case of prepayments of ABR Loans) or (ii) the Borrowing Minimum or a whole multiple of the Borrowing Multiple in excess thereof (in the case of prepayments of Eurocurrency Loans), and in each case shall be subject to the provisions of Section 2.18.

Agreement, § 2.11(a).

9

tight," and the company sought to raise additional capital.[5] *In re Citibank*, 520 F. Supp. 3d at 399. Revlon accomplished this through a series of transactions in May 2020 (together, "the May 2020 Transaction"). Revlon entered into a credit agreement with a subset of the 2016 Lenders (or their affiliates), using collateral that had originally secured the 2016 Loan to secure instead new loans extended by these Lenders.[6] *In re Citibank*, 520 F. Supp. 3d at 399.

    As part of the May 2020 Transaction, Revlon issued a senior secured term loan facility in an aggregate principal amount of $815 million, plus the amount of certain fees and accrued interest that had been capitalized.

---

[5] According to a complaint (discussed in detail below) which all Defendants except Tall Tree authorized UMB Bank to file against Revlon and Citibank, "Revlon reported an operating loss of $186.2 million and net loss of $213.9 million in the first quarter of 2020. Its reported net sales in the first quarter of 2020 declined $18.1 from the same prior-year period and adjusted EBITDA decreased 26.8%." J.A. 174 [Comp. ¶ 167, *UMB Bank, N.A. v. Revlon, Inc.*, No. 1:20-cv-06352 (S.D.N.Y. Aug. 12, 2020) ("UMB Bank Complaint")].

[6] The UMB Bank Complaint stated that the May 2020 transaction would "siphon away substantially all of the collateral from the 2016 Term Lenders." UMB Bank Comp. ¶ 11.

J.A. 1132. Of that $815 million, Revlon used (i) $65 million to repay a revolving credit facility, *id*., which it had obtained the previous month, J.A. 1135, (ii) approximately $246 million to pay outstanding principal, interest, and other fees on a Term Loan obtained in 2019 and due in 2023, J.A. 1134, and (iii), $112.8 million to repurchase and cancel a portion of the 2021 Notes, *id*.

The May 2020 Transaction also included an amendment to the Agreement that granted a subset of Lenders that participated in the refinancing ("BrandCo Lenders") what are called "roll-up" rights – the right to exchange their position in the 2016 Term Loan for a position in new term loans scheduled to mature in 2025. *In re Citibank*, 520 F. Supp. 3d at 399. The aggregate principal amount that could be "rolled-up" from the 2016 Term Loan to the new loans was $953 million. J.A. 1132.

The aggregate result is that the May 2020 Transaction enabled Revlon to issue a new $1.7 billion debt facility, of which over $800 million was "new financing." *In re Citibank*, 520 F. Supp. 3d at 399.

As part of the May 2020 Transaction, Revlon issued a "solvency

11

certificate" asserting "that the company is solvent and would be able to meet [its] liabilities or service those liabilities as they come due." *Id*.

As previously noted, the May 2020 Transaction included an amendment to the 2016 Loan Agreement making some collateral that had previously secured the 2016 Loan serve instead as collateral for new loans. *Id*. Several of the Debtholders, including Defendants' clients, objected to the May 2020 Transaction, contending that it violated the terms of the 2016 Loan Agreement, and labeling it an effort to "siphon away collateral that was providing essential security for payment of the 2016 Loans." *Id*. Nonetheless, Revlon executed the transaction in May 2020, asserting that it had secured the approval of a sufficient number of the holders of the 2016 Loan to allow that withdrawal of collateral.

This dispute gave rise to litigation in which a number of Debtholders — including those associated with all Defendants here except Tall Tree — authorized UMB Bank, the designated successor to Citibank as their Administrative Agent on the 2016 Loan, to file a lawsuit against Revlon and Citibank, asserting a variety of claims stemming from

12

the May 2020 Transaction. *Id.* at 409.

Several allegations in the UMB Bank Complaint are pertinent here. First, the UMB Bank Complaint alleged *inter alia* that, in the May 2020 Transaction, Revlon improperly siphoned collateral away from the 2016 Debtholders, such as the trademarks and other intellectual property associated with Revlon's most famous brands including Elisabeth Arden, the value of which was "enormous relative to the value of the entire Revlon enterprise." UMB Comp. ¶ 2. Second, it alleged that Citibank and Revlon had improperly manipulated the voting provisions of the 2016 Loan Agreement to gain approval of an amendment that permitted Revlon to strip collateral backing the 2016 Loan. *In re Citibank*, 520 F. Supp. 3d at 446-47. Third, the UMB Bank Complaint alleged that an event of default had already occurred on the 2016 Loan, and sought to accelerate payment of the Debt. *Id.* at 409. Finally, it also alleged that Revlon was insolvent by as much as $1.71 billion, UMB Comp. ¶ 170, and was "facing a severe liquidity crisis compounded by the global COVID-19 pandemic." *In re Citibank*, 520 F. Supp. 3d at 409.

13

The UMB Bank Complaint was filed on August 12, 2020, at approximately 2:06 p.m. — roughly twenty hours *after* the August 11 wire transfers. *Id.* The 117-page complaint had, however, been under discussion for some time, and the Defendants bringing the suit had authorized the filing of the Complaint between July 30 and August 10, 2020, just before the August 11 wire transfers. *Id.*[7]

## C. Revlon Offers to Exchange the 2021 Notes

As noted above, the maturity date on the Loan was subject to acceleration if the 2021 Notes remained outstanding on November 16, 2020. On August 7, 2021, four days prior to Citibank's accidental payment, Revlon offered to exchange the 2021 Notes for new notes due in 2024. J.A. 1359. Revlon's purpose in making the exchange offer was to avoid the acceleration of the 2016 Loan. J.A. 861 [Tr. 889-90]; J.A.867 [Tr. 913]. Needless to say, none of Revlon's disclosures with regard to the exchange mentioned anything about raising funds to pay off the 2016 Term Loan, as Revlon was giving no consideration to making such a

---

[7] The *UMB Bank* action was voluntarily dismissed on November 6, 2020.

14

payment. J.A. 867-68 [Tr. 914-917].

**D. The Events of August 11, 2020**

On August 2, 2020, five of the Debtholders, all managed by Angelo Gordon and Co. ("Angelo Gordon"), were exchanging their positions in the 2016 Loan for positions in the new Revlon credit facility via a "roll-up" transaction. *Id*. at 400. As part of a "roll-up" transaction, the borrower pays the exchanging debtholder interim interest accrued as of the date of the transaction, but does not pay the outstanding principal; instead, the borrower delivers notes for the principal amount of the new loan. *Id*. at 399. For reasons of administrative convenience in effectuating the Angelo Gordon roll-up, Revlon decided to pay accrued interest to *all* of the 2016 Debtholders, even though no interim interest payment was due to those not participating in the Angelo Gordon roll-up. *Id*. at 400. To that end, on August 11, 2020, Revlon sent Citibank a direction letter instructing Citibank to effectuate the repurchasing of the Angelo Gordon Debtholders' interests in the 2016 Loan as part of the roll-up transaction, specifying August 11, 2020, as the repurchase date. Citibank did not

15

notify other Debtholders that it would be rolling up the Angelo Gordon debt. The other 2016 Debtholders thus had no awareness that they would receive accrued interest on the date of the Angelo Gordon roll-up.

Citibank's Asset-Based Transitional Finance ("ABTF") team, a subgroup of Citibank's Loan Operations group that is focused on processing and servicing asset-based loans, was tasked with executing the roll-up. This would be done on Flexcube, a software application and loan processing program, which Citibank used for initiating and executing wire payments. *Id*. at 400. On Flexcube, the easiest (or perhaps only) way to execute the transaction — to effectuate the roll-up, paying interim interest accrued as of August 11, 2020, and reconstitute the 2016 Loan with only the remaining Debtholders — was to enter it in the system as if paying off the loan in its entirety, thereby triggering accrued interest payments to all Debtholders, while directing the principal portion of the payment to a "wash account" — an internal Citibank account used to account for internal cashless fund entries, ensuring that the money does not leave the bank. *Id*. at 400-01. At around 4:00 p.m. on August 11, 2020,

16

the ABTF team was informed that there would be a "Roll-up Repurchase for Revlon TL 2016 scheduled to close either 8/11/2020 or 8/12/2020" and was told to "pay the Principal to the Wash Account when accrued interest is processed effective 8/11/2020." *Id.* at 401.

At 4:54 p.m., Citibank received from Revlon the funds needed to make the interest payments to the Debtholders, and the ABTF team was instructed to proceed. *Id*. Several members of the ABTF team, including some of those involved in processing the August 11 wire transfers, were employees of Wipro Limited ("Wipro"), an entity based in India. These Wipro employees worked exclusively on Citibank matters and maintained Citibank email addresses. *Id*. After receiving the 4:54 p.m. email, Arokia Raj, a Wipro team manager and member of Citibank's ABTF team, directed Santhosh Kuppusamy Ravi, another Wipro employee, to begin processing the transaction according to the instructions the ABTF team had received. *Id*. The ABTF team understood that it was expected to remit interest payments to the Debtholders and to move an amount equal to the outstanding principal — approximately

17

$894 million — into Citibank's internal wash account. The principal was not to be sent to the Debtholders or to leave the bank at all. *Id*. Placing the principal into the wash account would allow the loan to then be rebuilt to reflect a slightly smaller remaining principal balance following the roll-up of the Angelo Gordon Debt.

To process a transaction of this type, the ABTF team needed to undertake a number of steps including creating an interest schedule, drafting invoices ("Calculation Statements") to be sent to Debtholders, and inputting payment instructions in Flexcube. *Id*. The transaction was subject to Citibank's "six-eye" approval procedure, which requires that three people review and approve a transaction before it is executed. Under this procedure, (1) the "maker" — in this case, Ravi — first inputs the payment information into Flexcube; (2) the "checker" — here, Raj — then reviews and verifies the transaction; and finally (3) the "approver" — here, Vincent Fratta, a Citibank senior manager based in Delaware — serves as a final check on the maker and checker's work. *Id*.

Because the vast majority of wire transactions that Citibank

processed using Flexcube involved the payment of funds to third parties, the default option, unless suppressed, causes any payment entered into the system to be transferred as a wire payment. *Id.* Citibank's internal Fund Sighting Manual provided instructions for suppressing Flexcube's default. When entering a payment, the employee would be presented with a menu with several boxes that could be checked along with an associated field to input the account number. *Id*. The Fund Sighting Manual explained that, in order to suppress payment of a principal amount, "ALL of the below field[s] must be set to the wash account: FRONT [;] FUND [; and] PRINCIPAL" — meaning that the employees were required to check all three of those boxes and input the wash account number into the relevant fields. *Id*. at 402. Notwithstanding these instructions, Ravi, Raj, and Fratta all believed — incorrectly — that a wire transfer of the principal could be properly suppressed by setting only the "PRINCIPAL" field to the wash account. *Id*. Accordingly, when Ravi built out the transaction between 5:15 and 5:45 p.m., he checked off only the PRINCIPAL field, and did not check the FRONT and FUND fields.

At 5:45 p.m., Ravi emailed Raj for approval of the transaction, explaining that "Princip[al] to Wash A[ccount] & Interest to DDA [Demand Deposit Account]." *Id*. After reviewing the transaction, Raj believed — incorrectly — that the principal would be sent to the wash account and only the interest payments would be sent out to the Debtholders. Raj then emailed Fratta, seeking final approval under the six-eye review process, explaining, "**NOTE**: Principal set to Wash and Interest Notice released to Investors." *Id*. Fratta, also believing incorrectly that the default instructions were being properly overridden, responded to Raj via email, "Looks good, please proceed. Principal is going to wash." *Id*. at 402-03.

Raj then proceeded with the final steps to approve the transfers, which prompted a warning on his computer screen — referred to as a "stop sign" — stating: "Account used is Wire Account and Funds will be sent out of the bank. Do you want to continue?" *Id*. at 403. But the "stop sign" indicated neither the amount that would be "sent out of the bank," nor whether it constituted the amount of the interest payment (which was

20

intended to be sent out of the bank), the amount of the outstanding principal on the loan, or a total of both. *Id*. Because Raj intended to release the interim interest payment to the Debtholders, he clicked "YES." *Id*. Shortly after 6:00 p.m., Raj emailed confirmation of the transaction to the team: "Principal set to wash and Interest paid to investors with Invoice." *Id*. At 6:53 p.m., following standard procedure, Ravi sent Raj the back-up documentary support for the transaction, including the approval emails, a record of receipt of the interest payment from Revlon, and screenshots from Flexcube showing that the payments had been made. Although these screenshots showed both $7.8 million in interest and $894 million in principal under the "Amount Paid" field, Ravi did not perceive anything to be amiss because he believed — incorrectly — that the system reflected the principal as having been paid to Citibank's internal wash account. *Id*.

The ABTF team was also responsible for generating and sending to the Debtholders the Calculation Statements, which provided notice of the payment of interest. *Id*. The Calculation Statements, of course, made no mention of a payment of principal. They were sent to the Debtholders

21

through custodians, administrators, or trustees at approximately 5:30 p.m. on August 11, 2020 — shortly before the payments themselves. *Id*. Each Calculation Statement stated: "Please be advised that Interim Libor Interest will be paid on the LIBOR outstanding under the above referenced facility," *i.e.*, the 2016 Loan. *Id*. Each Calculation Statement then explained that "[i]nterim interest is due as per the detailed calculation below." *Id.* The "Interest Due Period" was listed as "29-MAY-2020 to 11-AUG-2020." *Id.* After listing the applicable interest rate and number of days, each Calculation Statement included a "Total Due," followed by a dollar amount — the amount of accrued interest being paid to the particular Debtholder. Next, each Calculation Statement explained, "We will credit your account representing the above Interim Interest based on the following instructions," listing a "Credit Date" of "11-AUG-2020"; a "Total Due," followed by the same dollar amount; a deduction for tax withholding; and finally a "Credit Amount" (the amount of interest being paid). *Id.*

22

In total, Citibank paid out $894 million in principal and $7.8 million in interim interest. The amount received by the Debtholders matched to the penny the amount of principal and accrued interest outstanding on the 2016 Loan for each Debtholder. *Id*. at 432. The $894 million principal payment was made with Citibank's own funds, as Revlon, of course, had no intention of making that payment. At the time, the 2016 Loan was trading between 20-30 cents on the dollar. *See* J.A. 778, 815, 890 [Tr. 559, 704, 1004-05].

E.  **Citibank's Response to the August 11 Wire Transfers**

Around 9:00 a.m. the following day, August 12, 2020, Raj, as part of his normal responsibilities, began reviewing the "cash break manager application" to identify any "cash breaks" — that is, discrepancies between credits and debits from the previous day's transactions. *In re Citibank*, 520 F. Supp. 3d at 404. This type of reconciliation activity is an important back office function at most financial institutions and is undertaken to ensure that anticipated incoming and outgoing payments match the actual banking activity. *Id*. Raj quickly discovered significant

discrepancies in surprisingly large amounts and realized that, in addition to the intended interest payments, amounts equal to the outstanding principal balance on the 2016 Loan had gone to the Debtholders, instead of going to the wash account. *Id*. At 9:37 a.m., Raj emailed Fratta that "Principal was set to wash and only Interest was set to DDA. But, it looks like funds ha[ve] gone out . . . . Can you please review and advi[s]e if this need[s] to be raised to tech." *Id*. Fratta expressed surprise and suggested in a chat with Raj that the principal payment could have been the result of a "tech issue." *Id*.

At 9:52 a.m., Fratta broke the news to his supervisor, Vincent Farrell, head of Citibank's North American Loan Operations, in a Skype chat. "[B]ad news," he wrote. "[P]rincipal to wash, wires look[ ] like they went out the door." *Id*. Fratta followed up a few minutes later: "[Y]up, confirmed. [P]rincipal out the door when it was supposed to be sent to wash for Revlon restructure." *Id*. At 10:26 a.m., Fratta emailed Citibank's technology support group:

24

Yesterday we processed a payment with Principal to the wash and Interest to be sent to noteholders. All details in the front end screens yesterday le[d] us to believe that the payment would be handled in that manner . . . . Screenshots provided below indicating that the wash account . . . is present and boxes checked appropriately for the principal components.

*Id*. Fratta then forwarded the same email to members of his team, with the subject line "Urgent Wash Account Does not Work." *Id*. He stated: "Flexcube is not working properly, and it will send your payments out the door to noteholders/borrowers. The wash account selection is not working. This led to ~1BN going out the door in error yesterday for an ABTF Deal, Revlon." *Id*.

At 10:46 a.m., Ravi also emailed the technical support team, attaching screenshots of the Flexcube options that had been selected and explaining that "[w]e have processed principal to wash and Interest to DDA[,] however funds ha[ve] gone out along with principal in the . . . transaction." *Id*. Over the course of the day, Fratta learned that the principal payments were not caused by a system failure, but by human error: the failure to select the FRONT and FUND fields when inputting

25

the default override instructions in Flexcube. *Id*. at 404-05. Around 1:53 p.m., Fratta emailed his front office colleagues working on the 2016 Loan and explained:

> During our processing and internal rebooking of this Agented deal, we had a processing error, which [led] to the full principal amount of the loan outstanding being sent via wire to all of the noteholders in the deal. Each of the 315 noteholders received their pro rata share of 893,944,008.52 as of 8/11/20 of the full amount of the loan, which is incorrect. We intended to only remit their share of interest and not the principal. We will be contacting the lenders asking them to return their share of this erroneous payment as soon as possible.

*Id*. at 405.

At approximately 2:25 p.m., Citibank began sending Recall Notices to the Debtholders explaining that funds had been transmitted erroneously. *Id*. The first set of Recall Notices informed recipients that "we have paid Interest accrual from May 29th to August 11th. Your share of Principal amount was also released erroneously." *Id*. After listing the recipient's share of the principal payment, each Recall Notice in the first tranche requested that the recipient "[p]lease return the principal portion

of the payment you received . . . as soon as possible." *Id.* At approximately 6:00 p.m. on August 12th, Citibank sent out a second set of Recall Notices, similarly listing an "Amount Paid in Error" and advising each recipient that "we have paid Interest accrual from May 29th to August 11th. An additional amount was included in your interest payment in error and you were overpaid. Please return the amount listed below as soon as possible." *Id*. Citibank distributed a third set of Recall Notices the next day, August 13th, largely identical to the second set of notices sent out the previous day. *Id*. Finally, Citibank sent additional follow-up Recall Notices a few days later, stating that "on August 11, 2020, Citibank funds were mistakenly remitted to you. To be clear, those funds belong solely to Citibank; they are not borrower or Revlon 2016 Loan facility funds. In view of this mistaken transfer, you are legally obligated to return those funds and, as is standard industry practice when fund transfers occur mistakenly, we expect that you will return those funds to Citibank immediately." *Id*. Throughout this period, Citibank also made other efforts to contact the Debtholders and their related entities,

27

including Defendants, regarding return of the erroneous transfers. *Id*.

**F. Defendants' Responses to the August 11 Wire Transfers** [8]

Managers representing approximately two hundred Debtholders honored Citibank's Recall Notices and returned about $385 million to Citibank. However, the ten Defendants representing 126 Debtholders with approximately $500 million in debt refused to return the funds.

Six of the ten Defendants did not become aware that their clients had received payments exceeding accrued interest until their receipt of notification from Citibank that the payment had been made in error. *Id*. at 406 (Bardin Hill), 407 (Greywolf), 408 (New Generation and Medalist), and 409 (ZAIS and Tall Tree).

The four remaining Defendants became aware of the principal payment prior to receipt of the Recall Notices:

(i) Allstate learned of the transaction on the morning of August 12 and raised the question in-house, "Could this be a mistake?" but made

---

[8] The responses of the Defendants are laid out in further detail in the district court's opinion.

no effort to learn the answer other than by checking to see whether the principal payment had gone to its Debtholder-clients. *Id*. at 406. At trial, the author of the message testified that "her reference to a 'mistake' . . . was not to Citibank or Revlon, but to the possibility that the report of funds received had been mistaken." *Id*. at 438. Allstate was sent a Recall Notice by 3:05. *Id*. at 406.

(ii) Brigade received an email from an administrator for several of its clients, attaching a cash flow statement indicating the payment. *Id*. at 407. It received the email at 11:29. *Id*. at 436. By around 2:30 p.m., Jeffery Frusciante, a bank debt manager at Brigade, messaged Brigade's internal counsel, asking: "Revlon full paydown?" *Id*. at 407. Shortly thereafter, Frusciante noted that Citibank "just . . . sent a notice" advising that the share of principal was "released erroneously." *Id*.

(iii) Symphony took steps to determine from administrators and custodians for its Debtholder-clients whether each of them had received similar payments of principal, and on learning that each had received such payments, it instructed a custodian to apply the funds on its books

29

as a loan paydown. Citibank sent Symphony a recall notice at 2:23 p.m. On receipt of Citibank's Recall Notice advising of the error, it instructed its custodians not to comply. *Id*. at 408.

(iv) At HPS, early on the morning of August 12, a fund administrator sent management an email expressing surprise that "there was a full princip[al] repayment on this instrument . . . as the [Calculation Statement sent by Citibank] does not indicate it." *Id.* at 407. By that afternoon, HPS learned from the administrators of its funds that the full amount of principal and interest had been received from Citibank the day before. Around 2:30 p.m., it received Citibank's Recall Notice. *Id*.

In no instance did any Defendant call Citibank or Revlon or make any other inquiry (other than ascertaining the receipt by its Lender clients of payments equaling the outstanding balance on their loans).

**G. Procedural History**

Citibank commenced this litigation on August 17, 2020 by filing suit against Brigade, bringing claims of unjust enrichment, conversion, money had and received, and payment by mistake.

30

The next day, Citibank filed a second lawsuit alleging substantially identical claims against HPS and Symphony. Finally, on August 20, 2020, Citibank filed a third lawsuit bringing the same claims against the remaining Defendants. The district court promptly issued temporary restraining orders ("TROs") barring the Defendants and their "agents, servants, employees, officers and all persons and entities in active concert and participation with them" from "removing, withdrawing, transferring, assigning, or otherwise disposing of" the funds in contention. The district court also consolidated the three cases pursuant to Federal Rule of Civil Procedure 42(a)(2). On consent of the parties, the consent of the Defendants to extensions of the TROs, and a finding of good cause, the district court consolidated the hearing on any motion for a preliminary injunction with trial on the merits, as expressly authorized by Federal Rule of Civil Procedure 65(a)(2).[9]

---

[9] We express special admiration for the district court's handling of Citibank's motion for a preliminary injunction to freeze the funds it had accidentally paid. The court, after granting TROs, secured the consent of the Defendants (excepting one which did not yet have counsel but

thereafter, upon obtaining counsel, made no objection) to an extension of the TROs through trial. The court then consolidated the hearing on the preliminary injunction motion with trial and conducted trial without unnecessary delay, after allowing the parties the time needed for discovery. In circumstances where the non-moving parties will not suffer excessive harm resulting from such an extension of a TRO through trial, this procedure substantially serves the interests of all concerned, potentially saving very substantial time and money without adverse consequences.

Many preliminary injunction rulings, including appeal from the district court's grant or denial of relief, take close to a year, or more, to resolve. In addition, in many cases the ultimate ruling on preliminary injunction will fail to make clear which side will ultimately prevail, thus still requiring trial on the merits. This can be for many reasons, including that the standard for grant of a preliminary injunction turns not on entitlement to final relief but only on *likelihood* of success on the merits, that the trial evidence will not be limited to the preliminary injunction evidence, and that at trial there may be a new factfinder (the jury). In short, separate proceedings on the preliminary injunction motion can consume vast amounts of time and money with very little benefit. We of course recognize that in many cases the imminence of irreparable harm to one side or the other requires immediate, separate litigation of the motion, but in other cases, the procedure adopted by the district court can vastly improve the efficiency and value of the judicial process. *See* FED R. CIV. P. 65, advisory comm. note to 1966 amendment ("The authority [to consolidate the preliminary injunction hearing with a trial on the merits] can be exercised with particular profit when it appears that a substantial part of evidence offered on the application will be relevant to the merits and will be presented in such form as to qualify for admission on the trial proper . . . . It is believed that consolidation can be usefully availed of in many cases.").

In December 2020, the district court held a bench trial. Due to the ongoing COVID-19 pandemic, with agreement of the parties, the bench trial was conducted remotely using a Zoom-based video-conferencing platform with direct testimony taken largely by affidavit.

Following the trial, the district court ruled that the Defendants were entitled to keep the funds mistakenly paid. Relying on the *Banque Worms* decision of the New York Court of Appeals, *Banque Worms v. BankAmerica Int'l*, 570 N.E.2d 189 (N.Y. 1991), the court concluded that Defendants had "established the elements of the discharge-for-value defense," *id*. at 415, reasoning that on the date of the mistaken payment, the Debtholders were creditors of Revlon; each was owed – in principal and interest – the exact amount of money that they received from Citibank; neither the Debtholders nor the Defendants made misrepresentations to induce the mistaken wire transfers; nor were the Debtholders or the Defendants on notice of Citibank's mistake. *Id*. at 431-39. Citibank brought this appeal.

33

On June 15, 2022, while this appeal was under advisement, Revlon filed for Chapter 11 bankruptcy. *In re: Revlon, Inc.*, No. 22-10760 (DSJ) (Bankr. S.D.N.Y.). [10]

**STANDARD OF REVIEW**

"[A]fter a bench trial, we review the district court's finding of fact for clear error and its conclusions of law *de novo*. Mixed questions of law and fact are also reviewed *de novo*." *Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 187 n.2 (2d Cir. 2013) (citation omitted).

**DISCUSSION**

**I.     The *Banque Worms* Exception**

The traditional rule of New York law governing mistaken payments generally calls for restitution of the mistaken payment unless the recipient so significantly changed its position in reliance on the mistake that it would be unjust to require repayment. The Court of Appeals has explained, "In the area of restitution, New York has long recognized the rule that 'if A pays money to B upon the erroneous

---

[10] The automatic bankruptcy stay does not apply to this appeal.

34

assumption of the former that he is indebted to the latter, an action may be maintained for its recovery.'" *Banque Worms*, 570 N.E.2d at 191.

This rule "is predicated upon the principle that a party who pays money under a mistake of fact, to one who is not entitled thereto, must in equity and good conscience be permitted to get it back. That is a well-recognized principle of law . . . ."*Ball v. Shepard*, 95 N.E. 719, 721 (N.Y. 1911); *see also Kingston Bank v. Eltinge*, 40 N.Y. 391, 395 (1869) ("The defendants have received the money, which should have been paid to the plaintiffs, by their assent it is true, but which assent was based upon a mistake of fact. The principles of law will not permit the defendants to retain this money, unless there is something in the case to take it out of the general rule.").

The ruling of the New York Court of Appeals in *Banque Worms* endorsed an exception to that traditional rule based on the First Restatement's discharge-for-value principle.

In *Banque Worms*, Security Pacific International Bank, acting on behalf of its client Spedley Securities, had mistakenly sent nearly $2

million by wire transfer to Banque Worms, intended as repayment of Worms's loan to Spedley. *Banque Worms*, 570 N.E.2d at 190. The mistaken payment resulted from the following circumstances (in somewhat simplified version).

Worms had extended a loan to Spedley that was due and payable. *Banque Worms v. Bank Am. Int'l*, 726 F. Supp. 940, 940 (S.D.N.Y. 1989). Worms called for repayment, and Spedley accordingly instructed its bank, Security Pacific, to send its repayment using funds provided by Spedley. *Id*. Spedley, however, then changed its mind and sent Security Pacific a countermanding instruction, now directing that the funds be paid to a different payee. *Banque Worms*, 570 N.E.2d at 190-191. In the confusion arising from its client's change of instructions, Security Pacific mistakenly sent the repayment to Worms. *Id*. at 191.

Upon recognition of its mistake Security Pacific demanded that Worms return the mistaken payment. *Id*. Worms refused to return the mistaken payment. *Id*. In the ensuing litigation, initially brought in the

United States District Court for the Southern District of New York, Security Pacific sought restitution.

Upon appeal, our court certified to the New York Court of Appeals the question whether "New York would apply the 'Discharge for Value' rule as set forth at Section 14 of the [First] Restatement of Restitution or, in the alternative, whether. . . New York would apply that rule that holds money paid under a mistake may be recovered, unless the payment has caused such a change in the position of the receiving party that it would be unjust to require the party to refund." *Id*. The Court of Appeals concluded that "the discharge-for-value" rule would be applied, and that Worms was entitled to keep the funds. *Id.*

The term *discharge-for-value* was first employed (so far as we know) by the American Law Institute in its 1937 First Restatement of Restitution as the caption for the principle set forth in Section 14. First Restatement § 14. The text of the rule set forth under that caption reads as follows:

> A creditor of another or one having a lien on another's property who has received from a third person any benefit in

discharge of the debt or lien, is under no duty to make restitution therefor, although the discharge was given by mistake of the transferor as to his interests or duties, if the transferee made no misrepresentation and did not have notice of the transferor's mistake.

First Restatement § 14. The Restatement described that rule as "a specific application of the underlying principle of bona fide purchaser," the rule covered at Section 13 of the First Restatement. First Restatement § 14 cmt. a.

The *Banque Worms* court explained:

When a beneficiary receives money *to which it is entitled* and *has no knowledge that the money was erroneously wired*, the beneficiary should not have to wonder whether it may retain the funds; rather, such a beneficiary should be able to consider the transfer of funds as a final and complete transaction, not subject to revocation.

570 N.E.2d at 196 (emphases added).

The Court related its ruling to New York's then recent adoption of Article 4A of New York's' Uniform Commercial Code governing wire transfers of funds. The Court noted in an extensive discussion that the New York legislature, by adopting Article 4A, had accorded importance to the "speed, efficiency, certainty [of wire transfers] (i.e. to enable

participants in [wire] fund transfers to have better understanding of their rights and liabilities), and finality." *Id.* at 195. It reasoned that "[the] discharge-for-value rule is consistent with and furthers the policy goals of finality in business transaction and may appropriately be applied in respect to electronic funds transfers." *Id*. at 196.

In this litigation in the district court, the Defendants pleaded the applicability of *Banque Worms* and the First Restatement's discharge-for-value rule. Citibank advanced three arguments in opposition:

(i) Under the *Banque Worms* opinion, the discharge-for- value rule applies only when the recipient of the mistaken payment is "entitled" to the funds. It has no application here as the 2016 Loan was not payable for another three years;

(ii) The Defendants did not receive value in satisfaction of the discharge-for-value rule as none of them credited Revlon on their books after receipt of Citibank's apparent repayment of Revlon's loan;

(iii) The Defendants had constructive notice, which qualifies as "knowledge," of the error, and therefore do not qualify under the discharge-for-value rule for relief from the obligation to make restitution.

The district court in a thorough and careful opinion rejected each of these contentions.

Notwithstanding the district court's impressive and scholarly handling of the case, we respectfully disagree with some of its conclusions. We conclude that Citibank is entitled to prevail under the New York rule expressed in *Banque Worms* because (i) under the standards of New York law, the Defendants had constructive notice of Citibank's error, and (ii) the Defendants were not entitled to the money at the time of Citibank's accidental payment, as required by the *Banque Worms* ruling.

**A. Defendants cannot claim the benefit of the discharge-for-value rule because they were on notice of a mistake.**

As we read the law of New York, the discharge-for-value rule does not shield the beneficiary of a mistaken transfer from claims for

40

restitution if the beneficiary is on inquiry notice of the mistake. We conclude further, based on the facts available to the Defendants on August 11, that the standard of inquiry notice was satisfied. The facts were sufficiently troublesome that a reasonably prudent investor would have made reasonable inquiry, and reasonable inquiry would have revealed that the payment was made in error.

## 1. New York's notice standard

The parties agree that in New York the recipient of a mistaken payment does not receive the benefit of the discharge-for-value rule if it has constructive notice that the payment resulted from a mistake. As expressed in Section 14 of the First Restatement, the transferee of the payment "is under no duty to make restitution therefor . . . if the transferee made no misrepresentation and *did not have notice of the transferor's mistake*." First Restatement § 14 (emphasis added). Although in agreement that Section 14's reference to "notice" and Banque Worms reference "knowledge" mean constructive notice, the parties disagree as

to how the standard of constructive notice is understood in New York law.

Defendants contend that constructive notice is evaluated by asking what the transferee "knew or should have known" of the transferor's mistake.[11] Citibank contends that New York law applies the inquiry notice standard, of which the New York Court of Appeals has written:

> One who has reasonable grounds for suspecting or inquiring ought to suspect, ought to inquire, and the law charges him with the knowledge which the proper inquiry would disclose. . . . . If a person has knowledge of such facts as would lead a fair and prudent man, using ordinary thoughtfulness and care, to make further accessible inquiries, and he avoids the inquiry, he is chargeable with the knowledge which by ordinary diligence he would have acquired. Knowledge of facts, which, to the mind of a man of ordinary prudence, beget inquiry, is actual notice, or, in other words, is the knowledge which a reasonable investigation

---

[11] Defendants argued below that, for the purpose of the discharge-for-value rule, a transferee has notice of a transferor's mistake only if he or she has "actual knowledge" of the error. The district court rejected this argument, finding that the discharge-for-value rule required application of a constructive notice standard. *In re Citibank*, 520 F. Supp. 3d at 430. Defendants do not challenge that conclusion on appeal, and instead argue that constructive notice here means "knew or should have known" rather than on inquiry notice.

would have revealed.

*Fidelity & Deposit Co. of Maryland v. Queens County Trust Company*, 123 N.E.370, 372-73 (N.Y. 1919).

The district court did not decide that issue – finding that it was unnecessary to do so because, in the district court's view, the Defendants lacked constructive notice under either standard, *Citiban*k, 520 F. Supp. 3d at 431-440, and, in any event, if inquiry notice is the standard, this would not negate the Defendants' entitlement to the discharge-for-value defense because the Defendants conducted a reasonable inquiry which did not reveal the error. *Id*. at 439-40. The district court reached the latter conclusion on the basis that four of the ten Defendants – Allstate, Brigade, HPS, and Symphony – ascertained that more than one of their Lender clients had received payment of the outstanding principal amount of their loans, supporting the inference that Citibank had paid to the penny the outstanding principal and accrued interest, that this constituted reasonable inquiry, and it did not reveal the error. *Id*.

43

We believe Citibank has the better argument as to what constitutes constructive notice in New York. Both New York law and the First Restatement apply the inquiry notice standard and not a standard of "knew or should have known." As noted above, the Court of Appeals endorsed the inquiry notice standard in *Fidelity & Deposit Co. of Maryland*. It had previously adopted the same standard in *Williamson v. Brown*, 15 N.Y. 354, 362 (1857) ("where a purchaser has knowledge of any fact, sufficient to put him on inquiry as to the existence of some right or title in conflict with that he is about to purchase, he is presumed either to have made the inquiry, and ascertained the extent of such prior right, or to have been guilty of a degree of negligence equally fatal to his claim, to be considered as a bona fide purchaser."), and in *Anderson v. Blood*, 46 N.E. 493, 495 (N.Y. 1897. *See also Majer v. Schmidt*, 564 N.Y.S.2d 722, 725 (1st Dep't 1991) ("A person is chargeable with constructive notice of any fact which would have been disclosed by a reasonably diligent inquiry if circumstances are such as to indicate to a person of reasonable prudence

and caution the necessity of making inquiry to ascertain the true facts and he or she avoids such inquiry.").

New York courts have applied this interpretation of constructive notice in many different contexts. *Bennett v. Buchan*, 76 N.Y. 386, 390 (1879) (applying an inquiry notice standard in determining whether an assignee of a judgment took the assignment with notice that the judgment was worth less than the amount covenanted in the assignment); *Claflin v. Lenheim*, 66 N.Y. 301, 305-07 (1876) (applying an inquiry notice standard to determine whether the seller of goods was on notice that the purchaser lacked authority to purchase goods on behalf of the defendant); *Majer*, 564 N.Y.S.2d at 725 (applying an inquiry notice standard to determine whether recipients of funds were aware that the funds had been illegally converted from an estate); *Metro. Life Ins. Co. v. Morris*, 507 N.Y.S.2d 713, 715 (2d Dep't 1986) (applying an inquiry notice standard to determine whether property owners had been aware of a court order permitting them to redeem property). And in *In re Brainard Hotel Co.*, 75 F.2d 481 (2d Cir. 1935), this Court stated in a case governed by New York law that

45

whether a hotel that had received funds stolen from a guest as repayment for funds embezzled from the hotel could refuse to make restitution to the guests on the grounds that it was a bona fide purchaser turned on whether the hotel's treasurer "should have suspected that [the money] was improperly procured, and should have pressed his suspicions by inquiry." *Id*. at 482.

Conversely, we are aware of no New York cases where a party's liability turned on whether the party had constructive notice of a fact, but the court declined to apply an inquiry notice standard.

The First Restatement also makes clear that inquiry notice is the applicable standard to assess discharge-for-value under Section 14.[12] According to the First Restatement, the discharge-for-value rule "is a specific application of the underlying principle of bona fide purchase." §

---

[12] The same standard of inquiry notice is also espoused by the Third Restatement of Restitution and Unjust Enrichment, which states that "[a] person has reason to know a fact if . . . other facts known to the person would make it reasonable to infer the existence of the fact, or prudent to conduct further inquiry that would reveal it." RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT ("Third Restatement") § 69(3)(c).

14, cmt. a. The bona fide purchaser rule is covered in Section 13 of the First Restatement. Comment b to Section 13 tells that "the rules determining when there is notice are stated in Section 174." Section 174 in turn states that:

> A person has notice of facts giving rise to a constructive trust not only when he knows them, but also when he should know them; that is when he knows facts which *would lead a reasonably intelligent and diligent person to inquire* whether there are circumstances which would give rise to a constructive trust, and if such inquiry when pursued with reasonable intelligence and diligence would give him knowledge or reason to know of such circumstances.

First Restatement § 174, cmt. a (emphasis added).[13]

---

[13] Defendants argue against this conclusion by pointing out that Section 14 explicitly states that "comment a on Section 13 is applicable," but makes no such statement about comment b, the comment which refers to Section 174. We find no merit in the argument. Comment a to Section 13, which elaborates on the principle of bona fide purchases concludes by saying the principle it describes "also operates under the circumstances stated in Section 14." Comment b to Section 13 makes cross references to other sections covering several of the terms employed in Section 13's description of the bona fide purchase principle. We find wholly unpersuasive the Defendants' argument that comment b of Section 13 has no application to Section 14,

We are not persuaded by the arguments the Defendants advance against application of the inquiry notice standard. They argue that "New York courts have rejected an inquiry notice standard for cases involving monetary transactions", but the cases they cite in support of this proposition – *First Union Nat'l Bank v. A.G. Edwards & Sons, Inc.*, 691 N.Y.S.2d 491, 492 (1st Dep't 1999), and *Hartford Accident & Indem. Co. v. Am. Express Co.*, 542 N.E.2d 1090, 1096 (N.Y. 1989) – are inapposite. In both cases, victims of a fraud had sought to recover from those who had received, through normal commercial transactions, some of the fraudulently obtained funds. Under the circumstances, it was necessary for the plaintiffs to demonstrate that the ultimate recipients had accepted the funds in bad faith. *Hartford Acc.*, 542 N.E.2d at 1094 (holding that UCC § 3-304(7), applicable to transactions involving negotiable instruments, required a showing of bad faith to demonstrate notice); *First Union Nat'l*, 691 N.Y.S.2d at 492 (requiring subjective bad faith or dishonesty for

notwithstanding Section 14's explicit reference to the bona fide purchaser principle of Section 13.

48

recovery, by analogy to cases involving commercial paper). Both courts' rulings in favor of the defendants turned not on the inapplicability of the inquiry notice standard to issues of constructive notice, but on the fact that inquiry notice was insufficient to establish bad faith as required. *Hartford Acc.*, 542 N.E.2d at 1096; *First Union Nat'l*, 691 N.Y.S.2d 492. These cases do not suggest that constructive notice, in the context of the discharge for value defense, turns on any standard other than inquiry notice.

Defendants further contend that the inquiry notice standard is incompatible with the *Banque Worms* decision. We reject the argument. *Banque Worms* contained no discussion of the standard of notice because Worms, the recipient of the mistaken payment, had no reason whatsoever to suspect that there was a mistake. The standard of notice had no bearing on that case.

Finally, Defendants argue that Banque Worms implicitly rejected an inquiry notice standard by stating that the recipient of a wire transfer "should not have to wonder whether it may retain the funds" and

"should be able to consider the transfer of funds as a final and complete transaction, not subject to revocation". *Banque Worms*, 570 N.E.2d at 196. We disagree. The quoted passage had nothing to do with the type of notice utilized in determining whether the recipient of a mistaken payment is entitled to the discharge-for-value defense. As noted above, in the *Banque Worms* case, there was no issue of notice. The Court had no reason to discuss it. The Defendants' interpretation, furthermore, would eliminate not only inquiry notice but all forms of notice.

In sum, we find it clear that inquiry notice is the applicable notice standard in adjudicating a discharge-for-value defense in New York.

Implicit in the descriptions of the inquiry notice standard, although not expressly stated, is the need in some instances in applying the standard to hypothesize not only the reasonably prudent investor but also certain facts providing an incentive to make inquiry. The descriptions of the inquiry notice standard by New York courts quoted above make frequent reference to "prudence," to the proposition that the hypothetical person "ought to inquire" so that failure to do so would

50

make the person "guilty of a degree of negligence," to the "necessity of making inquiry to ascertain the true facts," and to "the existence of some right of title in conflict with that he is about to acquire." All of these imply that the hypothetical prudent person must be imagined to risk suffering some loss or harm if the benefit received proves illusory, as well as that the potential loss would be avoidable if the person learned the true facts. Prudence does not impose a duty to learn the true facts when one is not at risk of loss or when knowing the true facts would not help one avoid the loss. One cannot be said to lack prudence, or to be negligent, in failing to inquire when knowledge of the true facts would change nothing.

On the facts of this case, the lenders who received an unexpected apparent early repayment of principal from an insolvent debtor, in circumstances where there were visible red flags warning that the payment may have resulted from a mistake, had no incentive to investigate to ascertain the truth. Their investigations in the hope of learning the true facts would not have helped them avoid adverse consequences. If the Lenders or their Loan Managers had called Citibank

51

and learned that the payments resulted from mistake, there is nothing they could have done to change their circumstances.

In such circumstances, applying the inquiry notice rule requires hypothesizing about the hypothetical prudent person that he faces a circumstance akin to there being "some [unknown] right or title in conflict with that he is about to acquire," *Anderson*, 152 N.Y. at 293, such that, by investigating the red flags to determine the true facts, he could avoid the risk of loss that will arise if he fails to investigate. *See also Williamson*, 15 N.Y. at 362; Third Restatement § 69 cmt. f ("The standard that determines the inferences to be drawn and the inquiries to be made is that of a reasonable and prudent person *whose interests would be served by obtaining the knowledge in question*.") (emphasis added).

In other words, to apply the inquiry notice test in these circumstances, it is necessary to imagine that the hypothetical reasonably prudent person, who, upon receiving the payments received by the Defendants, and knowing the facts available to the Defendants, faces a risk of loss if the payment turns out to be mistaken, a risk he could avoid

by learning the true facts. If the suspicions and warnings raised by the red flags are so remote and improbable that it is consistent with reasonable prudence to ignore them without making inquiry, then the person is not on notice of the facts that reasonable inquiry would have revealed. On the other hand, if reasonable prudence on confronting those suspicions and warnings would call for making inquiry in the interest of avoiding a risk of the loss that would befall him if the payments proved mistaken, the person is on notice of the facts that would be revealed by reasonable inquiry.

**2. The facts of the August 11 transfer exhibited red warning flags that would have caused a reasonably prudent person who faced an avoidable risk of loss to make reasonable inquiry as to whether the transfer resulted from mistake.**

In our view, the Defendants are not shielded from Citibank's claims for restitution under the discharge-for-value rule because they were on inquiry notice that the unexpected and surprising apparent repayment of the full principal amount of their loans was attributable to mistake. On

53

August 11, Defendants were aware of four red warning flags consisting of facts suggestive of accident or mistake.

a) *The absence of prior notice of a prepayment, to which the Lenders were contractually entitled.* As explained below, the 2016 Loan Agreement required that Citibank give the Defendants prior notice if Revlon undertook to prepay the principal of the Loan. Section 2.11(a) of the Agreement, entitled "Optional Prepayments," permitted Revlon to make prepayments, but only "upon irrevocable written notice delivered to [Citibank] . . . three Business Days prior thereto." Agreement, § 2.11(a). "Upon receipt of any such notice, [Citibank was required to] *promptly* notify each relevant Lender thereof." *Id*. (emphasis added).

The Defendants, however, had received no prior notice from Citibank. In fact, they did not even receive such a notice of Revlon's intent to prepay together with the payment itself on August 11, at which time Citibank sent them notice of the interest being paid without reference to any payment of principal. The absence of prior notice from Citibank raised a substantial red flag supporting suspicion. Why would Citibank,

54

the Lenders' agent, have failed to perform its contractually required obligation to give the Lenders prior notice of Revlon's huge prepayment?[14]

In discussing the improbability of so gigantic a banking error, the district court emphasized that Citibank was "one of the most sophisticated financial institutions in the world." *In re Citibank*, 520 F. Supp. 3d at 433. That same factor supports the unlikelihood that Citibank would have neglected to give its clients a contractually required notification in a matter of such importance.

b) *The apparent inability of the insolvent Revlon to make a near $1 billion repayment.* A hypothetical prudent investor, who suddenly received an unannounced prepayment of the principal of the loan would have been astonished, in light of Revlon's apparent deep insolvency, that it could

---

[14] This was all the more surprising in that, had Revlon intended to prepay the Loan on August 11, it would have been contractually obligated to notify the Citibank five calendar days before, on Thursday August 6, three business days before the prepayment. Accordingly, five days would have passed without Citibank performing its contractual obligation to give its principals the prompt notice to which they were entitled.

find the resources to make a payment of nearly $1 billion. [15] The Defendants believed at the time (as alleged on their behalf in the UMB Bank Complaint filed on the day following the August 11 transfer) that Revlon was insolvent by as much as $1.71 billion. The belief that Revlon was deeply insolvent would have prompted substantial doubts on the part of the hypothetical prudent investor of Revlon's ability to make such a huge cash payment.

Those doubts would have been heightened by the fact that, as the UMB Bank Complaint filed on behalf of the Lenders explained, in May 2020, a few months previously, Revlon had committed as collateral assets that were "enormous relative to the value of the entire Revlon enterprise," UMB Comp. ¶ 2, in part by withdrawing collateral it had previously committed to the 2016 Loan, committing it instead to the May 2020 loan, in order to secure $800 million of new financing. Furthermore,

---

[15] A reasonable person in the Defendants' position, on seeing that one or more of his client-Lenders received what appeared to be full repayment of principal would assume that all Debtholders received a full paydown, as the Agreement provided that optional prepayments had to be made on a pro rata basis. Agreement § 2.11(c).

the Defendants recognized (and the UMB Bank Complaint alleges) that the COVID-19 pandemic, which was rampant in August 2020, had had disastrous effects on Revlon's make-up business, further restricting Revlon's access to funds. The UMB Bank Complaint, seeking to bar Revlon from diverting collateral from the 2016 Loan, expressed the Defendants' fear that Revlon would be incapable of paying their loan when it came due. To a prudent investor who knew what the Defendants knew, Revlon's sudden deployment of nearly a $1 billion to retire the 2016 Loan three years before it was due would have seemed bewilderingly improbable. This was a second red flag that would have stimulated doubt in the prudent investor as to whether the payment resulted from mistake.

c) *In view of the fact that the 2016 Loan was trading at 20-30 cents on the dollar, it could have been retired far more cheaply than by paying its full value.* A third red flag arose from the fact that, by reason of Revlon's perceived inability to repay the 2016 Loan, loan participations were trading at 20-30 cents on the dollar. If Revlon wished to retire the 2016 Debt prematurely,

57

it could do so far more cheaply by buying available participations on the market (until Revlon's purchases drove the price up to par) rather than by paying the full-face amount of the entire debt. But there was no evidence of rising market prices indicative of any sustained buying. It would have seemed strange and improbable to a prudent investor for the insolvent Revlon to pay much more than it needed to pay to retire the Loan.

*d) Revlon's elaborate contrivance only four days earlier to avoid acceleration of the 2016 Loan made no sense if Revlon was planning to retire that debt a few days later.* As recounted above, only four days prior to the August 11 surprise payment, Revlon had made an exchange offer to holders of the 2021 Notes. The apparent purpose of the exchange offer (as confirmed by the testimony of Revlon's former treasurer) was to avoid accelerating the maturity of the 2016 Loan through failure to retire the 2021 Notes by November 16, 2020. [16] If Revlon had been planning a

---

[16] J.A. 861 [Tr. 889] (testimony of Warren) ([Q.] Mr. Warren, was one of the ways that Revlon was looking to address the springing maturity an

58

*voluntary* acceleration of the 2016 Loan four days later, it had no reason to engage in the elaborate maneuver of the exchange offer to avoid its *involuntary* acceleration.

* * *

The district court never expressly stated a conclusion as to whether, under an inquiry notice standard, the facts of the August 11 transaction were suspicious enough to give rise to a duty to inquire. This was because the court reasoned that, if there was such a duty, the Defendants had discharged it by ascertaining that Citibank's payment exactly matched the outstanding principal plus accrued interest. However, the district court did conclude that "most of [Citibank's] purported red flags do not withstand scrutiny. And even taking them together they do not add up to notice of the mistake". *In re Citibank*, 520 F. Supp. 3d at 440; *id*. at 439 ("it is far from clear that the facts known to any Defendant (or its agents)

exchange offer -- can you tell me publicly whether or not Revlon -- can you tell me one of the ways that Revlon was looking to address the springing maturity? A. Yes. . . . Revlon did launch an exchange offer looking to exchange for new notes, as well as some cash considerations, existing 2021 notes.).

59

made it prudent to conduct further inquiry.") (internal quotation marks removed). To the extent that the district court's conclusion included the assessment that the facts of the August 11 transfer would not have sufficiently aroused the suspicions of a reasonably prudent investor to prompt further inquiry, we disagree.

What the district court found most persuasive was the fact that Citibank's payment matched to the penny the amount of outstanding principal plus interest owed to each lender. The court reasoned that:

> where, as here, a lender is minding her own business, and receives an unexpected and unscheduled payment from a borrower that matches exactly the amount of the borrower's outstanding debt, it is reasonable to assume that the borrower has intentionally paid off the debt. In fact, it might even be unreasonable to assume otherwise.

*Id.* at 433.

The court further found that the Defendants "believed, and were justified in believing, that the payments were intentional" because of the improbability "that Citibank, one of the most sophisticated financial

institutions in the world, had made a mistake that had never happened before, to the tune of nearly $1 billion." *Id*. at 451.

In rejecting Citibank's arguments regarding specific red flags, the court reasoned as follows.

As to Citibank's argument based on Citibank not having sent the Defendants prior notice of Revlon's intent to prepay, the district court dismissed this as having no red-flag significance. According to the district court's reasoning, because the Agreement did not define the word "promptly," the Agreement "did not necessarily require" that Citibank notify the Defendants before, or even together with, the actual prepayment. *Id.* at 443 (internal citation removed). The district court further relied on the fact that Citibank's officer who signed the Amended Loan Agreement conceded in his testimony that "he did not know if Citibank's obligation to 'promptly' notify the Lenders had to be satisfied prior to payment or could be satisfied up to seven days after . . . ." *Id.*

As for Citibank's argument based on the Defendants' belief that Revlon was deeply insolvent and lacked means to make a payment of

61

nearly $1 billion, the district court, while acknowledging that the argument "would undoubtedly raise a red flag in most instances," *id*. at 446, rejected it in the circumstances of this case for two reasons. The first was that, in the May 2020 Transaction, "Revlon was known to have paid off hundreds of millions of dollars in debt, some at par, even though its 'liquidity position' had been 'extremely tight[.]'" *Id*. If Revlon had done this in May, the district court reasoned, a reasonable investor would conclude that Revlon could do it again in August. The district court's second reason was that "Revlon was known to have the financial backing of billionaire Ronald Perelman and his holding company, MacAndrews & Forbes Inc., an investment firm that owned approximately 85% of Revlon's equity." *Id.* Defense witnesses had testified to having been "surprised many times over the years that [Revlon was] able to get some sort of a refinancing or prop up one of their entities . . . in spite of a view that it was going to be very difficult or impossible to do so." *Id*. "Given the reputations and history of Revlon and Perelman," the district court concluded that those beliefs "were not unreasonable." *Id*. It added that

the Defendants' antagonisms that led to the August 12 filing of the UMB Bank lawsuit made it "even more reasonable" for Defendants to believe "that Revlon and Citibank, perhaps with the help of Perelman and MacAndrews & Forbes, had figured out a creative way to" avert or neutralize that threatened suit. *See id*. at 447.

We believe that the district court's reasoning in deprecating Citibank's arguments based on these red flags depended on errors of law primarily involving the application of the inquiry notice test.

The district court's reasoning depended heavily on its factual findings that the Defendants believed in good faith that the payments they received were not the product of mistake, coupled with the court's conclusion that those beliefs were reasonable. We think this reasoning represented a misunderstanding of the inquiry notice test. The test is not whether the recipient of the mistaken payment reasonably believed that the payment was genuine and not the result of mistake. The test is whether a prudent person, who faced some likelihood of avoidable loss if the receipt of funds proved illusory, would have seen fit in light of the

warning signs to make reasonable inquiry in the interest of avoiding that risk of loss. In other words, when the information available to the recipient of an apparent repayment includes facts supporting a reasonable suspicion of mistake, the question is not whether the recipient reasonably believed the payment was valid. It is whether a reasonably prudent investor, focusing on all the available information (some supporting the validity, some supporting doubts) who would be at risk of an avoidable loss if the payment proved illusory, would have found the factors supporting doubt sufficiently troublesome in the mix to warrant making reasonable inquiry, in which case the recipient would be chargeable with the knowledge that such reasonable inquiry would have revealed. It is an objective test, not dependent on what the actual recipient believed. [17]

---

[17] Defendants argue that, under an inquiry notice standard, a court may impute to a party that which would have been learned via a reasonable inquiry only if, prior to the inquiry, the truth of the fact to be discovered via the hypothetical inquiry would appear to a reasonable person to be "probable, not merely possible." Defs.' Br. at 43. The only authority the Defendants cite in support of this proposition did not concern the issue

of notice in the context of a defense of bona fide purchaser for value. The issue in *Newman v. Warnaco Grp., Inc.*, 335 F.3d 187, 193 (2d Cir. 2003), was when the statute of limitations for federal securities fraud claims will begin to run. Our court ruled that the statute begins to run "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded" and that "[t]he fraud must be probable, not merely possible." *Id*. We agree with the Defendants that, under New York's inquiry notice test, the likelihood of fraud must be more than a mere possibility. It is always possible that the facts are otherwise than as represented. But the Defendants' argument that it must be probable, *i.e.* more likely than not, is not consistent with standard established by the New York Court of Appeals for notice in the context of a bona fide purchaser defense. The standard, as explained above, is neither "possible" nor "probable": it is somewhere in between and was defined by New York's highest court as falling where a hypothetical prudent investor would be prompted to make inquiry, rather than simply assume that the facts are as represented. *Reynolds v. Com. Fire Ins. Co.*, 47 N.Y. 597, 604 (1872) ("[W]hatever is notice enough to excite attention, and put a party upon his guard and call for inquiry, is notice of everything to which such inquiry might have led."); *Miner v. Edwards*, 634 N.Y.S.2d 306, 307 (4th Dep't 1995) ("[I]f the facts within the knowledge of the purchaser are of such a nature, as . . .to excite the suspicion of an ordinarily prudent person and he fails to make some investigation . . . he will be chargeable with that knowledge which a reasonable inquiry, as suggested by the facts, would have revealed") (internal quotation marks removed); *see also Fid. & Deposit Co. of Maryland*, 123 N.E. at 372 ("One who has *reasonable grounds* for suspecting or inquiring ought to suspect, ought to inquire, and the law charges him with the knowledge which the proper inquiry would disclose . . . .") (emphasis added).

Thus, where, as here, there are numerous recipients of the mistaken payment, the test comes out with the same result for each payee, regardless of one optimistic recipient having believed in good faith that the payment was valid, while another pessimistic recipient dwelled on the reasons to doubt, and a third recipient, like a number of these Defendants, having been oblivious to the issue. So long as the pertinent available information was the same for each, the result of the test would be the same for each.

With respect to several issues, the district court, we think incorrectly, justified its conclusions on the grounds that the Defendants' belief that there was no mistake was reasonable under the circumstances. A conclusion that those beliefs on the part of the Defendants were reasonable does not, however, negate that a reasonably prudent investor, to whom the red flag information was available, would have made a simple inquiry to avoid a loss. Those red flags were not explained away by the unlikelihood that a mistaken payment would have matched the amount of the outstanding debt.

Furthermore, we disagree with the district court's reasoning in its assessment of the extent to which the red flags would have raised the suspicions of a hypothetical prudent investor. In particular, the court's analysis of the red flag consisting of Citibank's failure to give the Lenders notice suffered from legal error. As noted above, because Citibank's contractual obligation was to give the Lenders notice "promptly" upon receipt of Revlon's contractually mandated three days prior notice, and because "promptly" was not defined in the Agreement, the district court concluded that Citibank had no contractual obligation to give the Lenders notice prior to the impending payment and could have waited for several days until after the Lenders' receipt of the payment without breaching its contractual obligation.

We do not think that the Agreement's requirement of prompt notification could be reasonably interpreted as allowing delay of several days so that the notice would not have arrived until after the payment. Although it is true that "promptly" was not further defined by the contract, that term is well understood to mean "without delay,"

"immediately," or "at once." Oxford English Dictionary (3d ed. 2007 online version) (defining "promptly" as "in a prompt manner; readily, quickly; at once, without delay; directly, forthwith, there and then."); American Heritage Dictionary of the English Language (5th ed. 2022 online version) (defining "promptly" as "[b]eing on time; punctual" or "[c]arried out or performed without delay"); Merriam-Webster Dictionary (https://www.merriam-webster.com/dictionary/promptly) (defining "promptly" as "in a prompt manner; without delay; very quickly or immediately"). We are aware of no evidence that could support the conclusion that Citibank, by waiting more than five days to inform the Lenders of an incoming full prepayment of the Loan, could have been said to have acted "without delay". Of course, how much delay the term "promptly" can accommodate can vary in different circumstances. But, for this circumstance, the district court's interpretation of the contractual term stripped that term of its contractual purpose. The provision of the Agreement, first requiring Revlon to give three days' notice to Citibank, and then requiring Citibank to "promptly"

notify the Lenders, had an obvious double purpose: first, to give Citibank advance opportunity to prepare to discharge its obligations to receive and pass on Revlon's prepayment, and then to give the Lenders advance opportunity to make provisions for advantageous immediate reinvestment of the funds. If, in accordance with the district court's interpretation, Citibank's obligation to pass along the notice "promptly" permitted Citibank to wait three, or five, or more, days before bothering to advise the Lenders, effectively depriving them of any opportunity to plan in advance for the reinvestment of the funds, the clause requiring Citibank to act "promptly" would lose its purpose. The Lenders had no need to be told of Revlon's intent to prepay after they had received the prepayment.

We believe the district court also erred in the significance it accorded to the testimony of Citibank officials to the effect that they did not know whether the contractual requirement to act "promptly" constituted a legal requirement of *prior* notification. For example, Tichauer, the officer who signed the Loan Agreement on behalf of

Citibank, testified (as summarized by the district court) that "he did not know if Citibank's obligation to 'promptly' notify the Lenders had to be satisfied prior to payment[.]" *In re Citibank*, 520 F. Supp. 3d at 443. The district court treated this testimony as effectively negating Citibank's argument that the Defendants' nonreceipt of a prior notification from Citibank was a red flag. We believe this was erroneous. The Defendants had no awareness of Tichauer's thinking on whether Citibank would have been under legal obligation to give prior notice. Furthermore, the reluctance of nonlawyers to give legal conclusions on the question whether Citibank would have been in breach of contract had little bearing on the significant question. The crucial question was whether a hypothetical prudent investor who might have incurred avoidable loss if the surprise payment proved illusory would have seen Citibank's failure to give notice as a factor supporting doubt, which, when taken together with the other visible red flags, would have led the prudent investor to make inquiry. While we cannot say that the testimony of Citibank's lay witnesses in response to questions about legal conclusions had no

70

relevance whatsoever, it had little bearing on the significant question and could not justify negating Citibank's contention that the nonreceipt of prior notice would have constituted a factor contributing to alerting the suspicions of the hypothetical prudent investor.

Furthermore, we believe the district court erred in its two reasons for minimizing the degree to which Revlon's apparent insolvency would raise doubts about its ability (or desire) to raise nearly $1 billion to prepay a loan by three years: first that Revlon, despite similar liquidly issues, had managed a few months before to execute the May 2020 transaction, raising over $800 million in new funding and second, that Ronald Perelman had a reputation for bailing out Revlon.

As for Revlon's recent success in securing new funding despite its dire financial condition, the fact that four months earlier Revlon had managed, despite its insolvency, by pledging what the Lenders' agent described in the UMB Bank litigation as an enormous percentage of its total assets, to borrow $800 million made it *less likely*, rather than more likely, that Revlon would be able to do this again four months later in

August 2020. The collateral used to enable the May 2020 borrowing was no longer available to support a borrowing in August 2020 to prepay the 2016 Loan. And as for the Defendants' deus ex machina hypothesis – that Ronald Perelman had injected $1 billion of new money into Revlon -- there had been no reports in the financial press of Revlon's obtaining any new financing.[18]

We also believe that the district court erred in giving weight to the proposition that a hypothetical prudent investor was unlikely to be troubled by these red flags if none of the recipients in the Lender-Defendant camp found them troublesome. *See In re Citibank*, 520 F. Supp.

---

[18] Citibank further argued in its opening brief that "[n]one of Revlon's disclosures for the 2021 Notes [Exchange] mentioned a simultaneous effort to raise additional capital to pay the 2016 Term Loan, though disclosure of such an effort would be expected as a matter of securities law." Citibank's Br. at 46-47. Citibank supports its contention by pointing to the fact that, Todd Eric Warren, Revlon's former corporate treasurer, on cross-examination agreed with the statement from Citibank's lawyer that "if Revlon was seeking to raise several hundred million dollars to pay off the term loan at the same time that it had the exchange offer open, that that would have had a material impact on the exchange offer and that financing effort would have had to have been disclosed?" J.A. 868 [Tr. 916-17]. Defendants have not argued to the contrary.

3d at 431-32, 435-39. That inference, however, does not follow under the inquiry notice test because the circumstances of the hypothetical prudent investor differ so substantially from those of the Defendants and Lenders.

First, the hypothetical prudent investor is charged with awareness of all the information that was available to the recipients of the mistaken payment. The Lenders and Defendants did not necessarily focus on the oddity that, in spite of its contractual obligation, Citibank had not given prior notice of the coming prepayment; the improbability that Revlon could have found the money to make a near $1 billion prepayment in its weakened financial condition; the unlikelihood that Revlon would have made the August 7 exchange offer for the purpose of avoiding an involuntary obligation to prepay the 2016 Loan if it was planning in any event to prepay that Debt four days later; and the unlikelihood that Revlon would pay par to retire the debt when a part of the debt could be retired more cheaply by purchases in the marketplace. These thoughts may not have crossed the minds of Lenders or Defendants at the moment of receipt of payment. On the other hand, the hypothetical prudent

73

investor is charged under the inquiry notice test with awareness of all the information that was available to the recipients of the payments. The test requires that he contemplate these concerns, of course giving them no importance if he concludes they have no importance.

Second, the hypothetical prudent investor faces a risk of avoidable loss if the payment proves illusory. His prudence in guarding against such a loss gives him a motivation and obligation to evaluate whether the red flags warn of a sufficient likelihood of loss to prompt inquiry. If that likelihood is sufficiently high, his prudence requires that he inquire. The Lenders and Defendants in contrast bore no risk of any loss that was avoidable. They had no incentive to ponder the likelihood that the payment would prove illusory. Making inquiry would not have improved or changed their outcomes.

As a result, the reactions of the Lenders and Defendants afford little or no basis for assessing the hypothetical reaction of the reasonably prudent investor.

74

Finally, Defendants and the district court identify several additional facts that weigh in favor of a belief of the genuineness of the transfer. These include the fact that the calculation statement received by the Lenders described the interest being paid as "due", a fact that would be true only if Revlon was paying principal, *In re Citibank*, 520 F. Supp. 3d at 443, and that the impending filing of the UMB Bank Complaint gave Revlon a motivation to rid itself of troublesome lenders who were threatening litigation. *Id*. at 446-47. We do not disagree that these facts tend to weigh in favor of a belief that the payment was genuine. Nonetheless, there remained troublesome red flags suggestive of doubts that were not explained away by the facts pushing in the opposite direction. The force of the factors supporting doubt need only be sufficient to prompt a prudent investor to make inquiry. Notwithstanding factors that tended to support genuineness, the factors supporting doubt were sufficiently troublesome to prompt a prudent investor at least to make a telephone call to Citibank. That is all that was needed to satisfy inquiry notice.

In sum, considering the factors correctly cited by the district court as supporting a reasonable belief that the payment was genuine, together with the factors identified by Citibank as red flags supporting doubt, we conclude that a reasonably prudent investor who faced an avoidable risk of loss if the payment proved mistaken and therefore subject to recall, would have seen fit to make a telephone call to inquire of Citibank.

### 3. A reasonable inquiry would have revealed the mistake.

The district court concluded that reasonable inquiry would not have revealed the mistake. We respectfully disagree.

The court arrived at this conclusion through the following reasoning. The court observed that John Byrne, an expert witness for Citibank, testified as to how a financial institution would investigate a circumstance in which it received from a bank more money than it expected, a phenomenon known as a "cash break." He testified that, when you have a cash break, you then investigate why there is a discrepancy, stating further:

Q. What does that investigation involve, in your opinion?

76

A. It's a series of many things. It's third-party market data, it's wisdom in some cases. And if the tools aren't available in-house or immediately to you, then you go to the source and determine who the source is representing, while typically there is an issuer or paying agent, trustee, what have you. So in this case, you go back to Citibank, ask for further clarification as to what the payment represents, get some type of confirmation as to what the payment represents. If you're unhappy with that response, then you contact the issuer itself, in this case it would be Revlon.

J.A. 930 [Tr.1167]. The district court interpreted Byrne's explanations to mean that "a reasonable inquiry could involve 'many things,'" including "third-party market data" and "wisdom in some cases." *In re Citibank*, 520 F. Supp. 3d at 439. According to Byrne, "your wisdom gives you the ability to do a sanity check . . . as to whether the information that you are being told is sufficient." J.A. 940 (Tr. 1207). Then, in the district court's words, "[a]ccording to Byrne, it was only if the flags remained red after consulting these sources – market data and 'wisdom' – that a reasonable investor would have consulted the sender of the funds to confirm whether the payments were intentional." *In re Citibank*, 520 F. Supp. 3d at 439. The court then quoted Byrne, "[i]f the tools aren't available in house or immediately to you, . . . . then you go to the source." *Id.*

77

Based on this testimony, the district court concluded that a reasonably prudent financial institution would not have necessarily gone to the source to ask whether there was an error. The court pointed out that some of the Defendants had taken the trouble to ascertain that "other Lenders had received a full paydown", and that the payments "matched the outstanding principal and interest to the penny." *Id*. at 440. "[A]pplying their 'wisdom' and experience, [the Defendants] concluded that the payments were intentional full prepayments of the loan." *Id*. The court relied on the testimony of Caraher, an executive of one of the Defendants, that "when a borrower or its administrative agent pays the exact amount owed in outstanding principal and interest, that is a clear indication that the loan is being paid down" and that he had "never, in almost 20 years in the industry, seen such a transfer made by accident." *Id*. (quoting J.A. 550 (Caraher Aff. ¶ 20)). The district court concluded that "[o]n Byrne's own view, that satisfied any duty of inquiry that a reasonable investor may have had. It follows that, even if Defendants are charged with the knowledge that a reasonable inquiry would have

78

yielded . . . they were not on notice that the payments were made by mistake." *Id.*

The fulcrum of the district court's reasoning was the proposition, which the district court attributed to Byrne, that "it was only if the flags remained red after consulting . . . market data and 'wisdom' that a reasonable investor would have consulted the sender of the funds." *Id.* at 439-40. The problem with the court's conclusion that the reasonable investor would not have inquired of the sender of the funds is that the red flags representing the reasons for doubt *did* remain red notwithstanding that the payments matched the amount of principal plus accrued interest.

The low likelihood of error when the payment matches the amount of the debt did nothing to explain away the four factors described above that furnished reasons for doubt. Those factors remained troublesome. The fact that the payment matched the amount of the debt did nothing to explain or dispel these sources of doubt. Under Byrne's formula, after consultation of market data and wisdom, the flags would have remained

red. The prudent investor, who, unlike these Defendants, ran a risk of incurring an avoidable loss if the payment proved illusory, would have placed a call to its agent Citibank to ask.

And beyond Byrne's testimony, we do not believe that, as a matter of New York law, an inquiry ascertaining that the payment matched the amount of the debt would qualify as a "reasonable inquiry" as the term is understood in the context of the inquiry notice standard. Under New York law, if a party has ready access to information that will either confirm or quiet their suspicions, a reasonable inquiry requires accessing that information. *Fid. & Deposit Co. of Maryland*, 123 N.E. at 373 (a reasonable inquiry by a bank into why checks cashed by one of its customers were countersigned by a clerk of court would involve asking the customer why the checkers were countersigned); *Ward v. City Trust Co. of New York*, 84 N.E. 585, 588 (N.Y. 1908) (a reasonable inquiry by a trust company into the propriety of a corporate officer's use of corporate funds to pay personal debts would have included an examination into whether the company's board of directors authorized the officer to so use

80

the funds, where "[t]he minute book of the board was open to examination by representatives of the trust company . . . ."). And if the first inquiry fails to answer material questions that could have been answered by a further inquiry that was not unreasonably onerous, and that a reasonable person would have readily identified as a reasonable inquiry, the first inquiry does not satisfy the obligation under New York law to make inquiry, or be charged with the knowledge that the inquiry would have produced. *See Ward*, 84 N.E. at 588 (a bank could not satisfy the obligation of inquiry into why corporate officers were using corporate funds to repay personal debts by simply asking the corporate officers what they were doing because the officers could not be relied upon to give a truthful answer as they were "acting in their own interest", and because a different inquiry – checking the minute book of the board – would just as easily reveal if the officers were acting within the scope of their authority). Here, a call to Citibank would have been an easy and obvious inquiry which, unlike simply confirming internally that the size of the payment matched the size of the debt, would have answered any

81

suspicion that the August 11 payment resulted from mistake. A payee who failed to call Citibank or Revlon, but relied instead on nothing more than ascertaining that the payment matched the debt, could not be said to have conducted a reasonable investigation.

In sum, while it was reasonable for the Defendants to begin their inquiry to resolve the red flags by ascertaining that the payments equaled the size of the debt, when that fact failed to explain away the red flags, the inquiry notice test required them to take the easy further step of placing a call to their agent Citibank, which had sent the payment. Having failed to make that call, they were chargeable with notice of what they would have learned. We conclude that the Defendants were on notice of Citibank's mistake and were thus ineligible to claim the discharge-for-value defense.

B. **Defendants are not protected by the *Banque Worms* ruling because on August 11, they were not entitled to the money they received from Citibank, as Revlon's debt was not yet payable.**

As we read the *Banque Worms* opinion, it made clear that the rule it espoused operated in favor of a recipient of a mistaken payment who was

"entitled" to the money. This is not only because the Court of Appeals said so, but also because every precedential ruling on which the *Banque Worms* opinion relied in support of denying restitution of a mistaken payment involved present entitlement of the payee to the money it received and two of the precedents expressly stated that that the rule was for circumstances in which the money was "due" to the recipient of the funds. In our case, the Defendants (and their Lenders) were not entitled to receive repayment for the Loans. Repayment was not due for another three years.

In undertaking to justify its ruling allowing Worms to keep the moneys paid to it by mistake, the Court explained,

> When a beneficiary receives money *to which it is entitled* and has no knowledge that the money was erroneously wired, the beneficiary should not have to wonder whether it may retain the funds; rather, such a beneficiary should be able to consider the transfer of funds as a final and complete transaction, not subject to revocation.

570 N.E.2d at 196 (emphasis added).

Worms was entitled to the money. The Defendants in our case were not. Worms' loan to Spedley was payable, and Worms had demanded payment. The Loan in our case was not payable for three more years.

The term "entitled" denotes "a legal right", Oxford English Dictionary (3d ed. 2013 online version) (defining "entitled" as "that has a legal right or just claim to do, receive, or possess something"); American Heritage Dictionary of the English Language (5th ed. 2022 online version) (defining "entitle" in pertinent part as "[t]o furnish with a right or claim to something."); Black's Law Dictionary (11th ed. 2019) (defining "entitle" as "[t]o grant a legal right to or qualify for"). A creditor has a "legal right" to funds loaned only when the debtor has an obligation to pay those funds. Indeed, Defendants do not cite a case (and we are aware of none) in which a Lender was described as "entitled" to funds, without qualification, when the lender had no right to demand payment until a future date.[19]

---

[19] Defendants argue that the Court of Appeals held that the discharge-for-value rule applied not because Spedley's debt to Worms was

84

Moreover, none of the New York precedents cited by the *Banque Worms* Court as support for its ruling, so far as they revealed, involved a debt that was not yet payable, *Carlisle v. Norris*, 215 N.Y. 400, 404-05 (1915); *Stephens v. Bd. of Educ. of City of Brooklyn*, 79 N.Y. 183, 185 (1879) (converted funds); *Southwick v. First Nat. Bank*, 84 N.Y. 420 (1881) (debt presently owed to a bank by its customer); *White v. Cont'l Nat. Bank*, 64 N.Y. 316, 317 (1876) (drawn bank draft); *Smith & McCrorken v. Chatham Phenix Nat. Bank & Tr. Co.*, 267 N.Y.S. 153, 3154-55 (1st Dep't 1933) (deposited check); *State Farm Mut. Auto. Ins. Co. v. Stokos*, 317 N.Y.S.2d

---

payable, but because Worms was a creditor of Spedley. Defs.' Br. at 18-19. Defendants claim this reading is supported by the *Banque Worms* Court's later statement that "[a]pplication of the 'discharge for value' rule to the circumstances presented here is particularly appropriate . . . .[among other reasons because] as a creditor of Spedley, Banque Worms was a beneficiary entitled to the funds who made no misrepresentation and did not have notice of the transferor's mistake." 570 N.E.2d at 197-98 (quotation marks removed). While it is true that Worms was entitled to the money and had demanded repayment, if its loan to Spedley had not been payable for another three years, as here, Worms would not have been "entitled" to receive payment. We see no reason to doubt that the court used the term "money to which it is entitled" with full awareness of its meaning, and not to mean "money it has loaned but to which it is not yet entitled."

706, 707 (Civ. Ct. 1970) (bill for auto repairs). Two of the cited precedents described the rule that justified denial of restitution in terms of the payees having received payment of a debt that was "due." *Carlisle*, 215 N.Y. at 415 ("If defendants received the proceeds in good faith and without notice of any wrong and credited them on an *indebtedness due them*, plaintiff is not entitled to recover them back.") (emphasis added); *New York Title & Mortgage Company v. Title Guarantee & Trust*, 201 N.Y.S. 529, 531 (1st Dep't 1923) ("The question now arises on this appeal whether the plaintiff, New York Title and Mortgage Company, may recover from the defendant Title Guarantee and Trust Company the money paid in satisfaction of the debt *due it* by Stainton.") (emphasis added). Accordingly, we see no reason to believe that the Court of Appeals did not mean what it said in characterizing the principle as applicable to a beneficiary's receipt of "money to which it is entitled." [20]

---

[20] Defendants argue that the Court of Appeals did not treat these cases as "stating the modern governing standard under New York law", but rather as "as an example of one of two 'divergent' lines of historical authority." Defs.' Br. at 27. While Defendants are correct that the Court

This reading of the discharge-for-value rule, furthermore, better harmonizes with New York's "general rule" covering the receipt of mistaken payments, which is that a party receiving money as the result of a mistake must return it. *Ball*, 95 N.E. at 721. The *Ball* court described the rule as "predicated upon the principle that a party who pays money under a mistake of fact, to one who is not entitled thereto, must in equity and good conscience be permitted to get it back . . . ." *Id.*; *see also Kingston Bank*, 40 N.Y. at 395; *Nat'l Bank of Com. in New York v. Nat'l Mechanics' Banking Ass'n*, 55 N.Y. 211, 213 (1873) ("It is now settled, both in England and in this State, that money paid under a mistake of fact may be recovered back, however negligent the party paying may have been in

of Appeals did not claim that the rules applied in these cases was identical to the rule applied in *Banque Worms*, the Court of Appeals clearly viewed these cases as indicative of the nature of the discharge-for-value rule. Specifically, the Court of Appeals identified *Carlisle*, *White*, *Smith & McCrorken*, *New York Title & Mortgage*, and *State Farm* as "cases that arguably lend[] support to the proposition that New York, long ago, embraced the 'discharge for value' rule", *Banque Worms*, 570 N.E.2d at 189. Furthermore, the Court of Appeals cited *Southwick* and *Stephens* as cases applying rules motivated by the sort of finality concerns that supported the Court to endorsement of the discharge-for-value rule. *Id.* at 195-96.

making the mistake, unless the payment has caused such a change in the position of the other party that it would be unjust to require him to refund."); *Union Nat. Bank v. Sixth Nat. Bank*, 43 N.Y. 452, 455 (1871) ("If the money is paid under the impression of the truth of a fact which is untrue, it may, generally speaking, be recovered back, however careless the party paying may have been in omitting to use due diligence to inquire into the fact."). This rule is rooted in "equity and good conscience." *Ball*, 95 N.E. at 721; *Mfrs. Hanover Trust Co. v. Chem. Bank*, 559 N.Y.S.2d 704, 707 (1st Dep't 1990) ("The principle that a party who pays money, under a mistake of fact, to one who is not entitled to it should, in equity and good conscience, be permitted to recover it back is longstanding and well recognized . . . . and rests 'upon the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another.'" (*quoting Miller v. Schloss*, 113 N.E. 337, 339 (N.Y. 1916)); *see also Columbia Mem'l Hosp. v. Hinds*, N.E.3d, No. 36, 2022 WL 1572408, at *6 (N.Y. May 19, 2022) (identifying whether "a benefit has been conferred on the defendant under mistake of fact or law" as a factor

in whether "it is against equity to permit a party to retain what is sought to be recovered."). In light of these principles, we see no reason to believe that the Court of Appeals, confronting our facts, would expand the exception represented by discharge-for-value beyond the scope that the Court expressly delineated in *Banque Worms*, and beyond the scope of the precedential authorities on which it relied.

A further reason that seems to us to favor a present entitlement requirement is that it better supports the reasons for the rule. According to the Reporters' Notes to the First Restatement, the rule serves as an administratively convenient way to allocate a loss between two parties where "there is no reason in justice why one should suffer rather than the other". §§ 13-14 Reporters' Notes. That condition is generally present when the mistaken payment is to one to whom the debt is due. On the other hand, when as here, where a transferee receives a mistaken payment on a debt not yet due, there often can be significant reasons why the mistaken payment ought to be returned and denial of restitution can result, as here, in a substantial disruption of the contractually adopted

89

order, as well as substantial reason in justice why the transferee should not be allowed to benefit from the mistake. This is illustrated by the present facts. Application of the discharge-for-value rule to our facts brings the Lenders a huge windfall over and above what they bargained for,[21] while an order of restitution would leave them exactly where they contracted to be. *Cf. Deutsch Tane Waterman & Wurtzel, P.C. v. Hochberg*, 890 N.Y.S.2d 755, 757 (App. Term 1st Dep't 2009) ("In the absence of any claim or showing that defendants detrimentally changed their position as a result of the plaintiff's single, surplus tax payment, defendants may not reap a windfall by retaining the payment, even if the payment may be said to have resulted from negligence.").

The district court rejected Citibank's argument that, in order to qualify for the benefit of the discharge-for-value rule the recipient of the mistaken payment must be entitled to the funds. It justified that

---

[21] It is true, of course, that prepayment is not *always* a windfall for creditors. But in those instances when retaining mistakenly prepaid funds is not in the creditor's interest, the creditor can simply opt to return the money.

conclusion primarily on the grounds that Section 14 of the First Restatement does not mention a requirement of present entitlement or debt due, as well as the fact that what the district court characterized as the "leading cases applying the discharge for value rule" do not mention a present entitlement element. *See In re Calumet Farm, Inc.*, 398 F.3d 555 (6th Cir. 2005), *Gen. Elec. Capital Corp. v. Cent. Bank*, 49 F.3d 280 (7th Cir. 1995), *Qatar Nat'l Bank v. Winmar, Inc.*, 650 F. Supp. 2d 1, 10 (D.D.C. 2009), and *NBase Commc'ns, Inc. v. Am. Nat'l Bank & Tr. Co. of Chi.*, 8 F. Supp. 2d 1071 (N.D. Ill. 1998). In addition, the district court cited a case in which the prevailing payee did not have a legal entitlement to the funds. *See Chase Manhattan Bank v. Burde*n, 489 A.2d 494, 497 (D.C. 1985).

We are not persuaded by the district court's reasoning or its precedents. While the district court is correct that Section 14 of the First Restatement does not mention a present entitlement requirement, it is the *Banque Worms* opinion, not the Restatement, that represents the law of New York. As noted, the *Banque Worms* opinion expressly specifies "entitlement" to the monies.

With respect to the four cases described by the district court as, the "leading cases," which did not specify a requirement of entitlement, we see two answers. First, none of them are New York cases. Second, while it is correct that none of them specifies a requirement of entitlement, none of them, so far as they reveal, involves a debt that was not yet due, and none specifies that the rule applies to such a debt. Finally, as to *Chase Manhattan Bank v Burden*, the beneficiary in that case was not a creditor but a limited partner. *Chase Manhattan Bank*, 489 A.2d at 494. The rule there enforced thus differed significantly from both Section 14 and *Banque Worms*. Moreover, the District of Columbia court's decision was substantially motivated by considerations of equity and fairness, *id*. at 497, considerations which disfavor the Defendants here.

Defendants argue that *Banque Worms* should be read to reject a present entitlement requirement on the grounds that it would contravene *Banque Worms*'s emphasis on the importance of finality if wire transfers require "a creditor who receives payment on an outstanding loan before

it comes due . . . [to] wonder whether it may retain the funds." Defs.' Br. at 26.

But while it is true that the *Banque Worms* court gave importance to finality of wire transfers, it does not follow that the *Banque Worms* court gave higher value to finality over all other values. To the contrary, the Court explicitly left standing New York's basic rule requiring return of the mistaken payments, except where identified exceptions are applicable. It also provided exceptions from denial of restitution based on equitable factors that arise, for example, when the transferee made misrepresentations or had notice of the mistake. There is no suggestion in *Banque Worms* that all such disputes are to be resolved in favor of finality, or that the undoubtedly significant factor favoring finality necessarily prevails over all competing values. [22]

---

[22] Defendants also argue that interpreting *Banque Worms* to include a present entitlement requirement would contravene the Court of Appeals's conclusion that "risk should be allocated to the bank transferor responsible for a mistaken transfer." Defs.' Br. at 24. But that sentence represented the Court's response to the facts of that case. The Court was not saying that, mistaken transferors should always bear the

In summary, the Court of Appeals's specified requirement of entitlement to the money, combined with the cases it cited as precedents for the rule, and its continued espousal of New York's general rule that mistaken payments should be returned, lead us to conclude that, in New York, a creditor may not invoke the discharge-for-value rule unless the debt at issue is presently payable. Here, the debt on which Citibank mistakenly made a payment was not due for another three years. As a result, Defendants may not invoke the discharge-for-value rule as a shield against Citibank's claims for restitution.

**CONCLUSION**

The judgment of the district court is VACATED and the matter is REMANDED to the district court for further proceedings consistent with this opinion. Defendants, their officers, agents, employees, successors, and all those in active concert or participation with them are enjoined

---

loss. It was clear, furthermore, that in the Court's assessment, Worms' entitlement to the money was an important factor along with the absence of equitable reasons for depriving Worms of the money it had received.

94

from removing, withdrawing, transferring, assigning, or otherwise disposing of the funds in contention in this suit (except with the approval of Citibank) until authorized by this court (or the Supreme Court) or by a ruling of the district court from which no appeal is taken.

**ADDENDUM**

LEVAL, J.

Writing for myself alone and not for Judge Sack or the Court, I add two short discussions, first questioning whether an accidental payment of the sort made here by Citibank comes within the scope of the Restatement's discharge-for -value rule, and, second, responding briefly to Judge Park.

A.  **Does the Restatement's discharge-for-value rule apply to monies transferred purely by accident?**

Although this issue has not been raised in the briefing, I question whether the facts of this case come within the discharge-for-value rule of the Restatement. Under its formulation, the discharge-for-value rule applies where a transferee "received from a third person any benefit *in discharge of the debt or lien* . . . [where] the discharge was given by mistake

of the transferor *as to his interests or duties*." First Restatement § 14 (emphases added).

First, the defense is limited to the circumstance in which the transferee "received from a third person any benefit *in discharge of the debt or lien*." It speaks of the understandings under which "the discharge was given." This clause refers to the transferor's motivations and intentions in making the payment. The payment must have been made with the intention to discharge the debt or lien in question. The rule has no application when the third-party transferor made the payment for a different reason – without intention to discharge the debt or lien, as would be the case if the payment was made as payment for a new purchase of goods by the debtor (or for any other reason).

Citibank had no intention to discharge Revlon's debt. Indeed, it had no intention to make a payment at all. The payment was made by accident and unintentionally, as the result of failing to check all the boxes on Flexcube's matrix necessary to override the default setting that would

96

result in payment. The payment was not made "in discharge of a debt" notwithstanding that Defendants so perceived it.

Second, the Restatement rule applies in circumstances where the transferor's payment resulted from his "mistake . . . as to his interests or duties." Citibank was not mistaken as to its interests or duties. It understood all of these perfectly and intended to act in accordance with a correct understanding of them. Its only mistake was its belief that checking a single Flexcube box would ensure that the money would remain in the bank.

Each of the illustrations to Section 14 of the First Restatement involves a transferor making a payment with the intention to discharge a debt or lien where the transferor made the payment based on either a mistake as to the duty to make the payment, or a mistake as to what would be received in return. The same is true of every precedent cited in the Reporter's Notes as an example of a consistent outcome. §§ 13–14 Reporters' Notes.

97

In my view, the facts of this case simply do not conform to those calling for the application of the rule of Section 14.

*Banque Worms* in contrast applied the rule in circumstances that fall under the rule of Section 14. Security Pacific intentionally paid Worms with the intention to discharge the debt owed by Spedley, in the mistaken belief that Spedley's specific instructions to do so remained effective. No precedential case cited in the *Banque Worms* opinion fails to conform to the fact pattern described in the Restatement version of the rule. *Carlisle*, 215 N.Y. at 404 (converted shares of stock deposited as payment on an account by the debtor); *Stephens*, 79 N.Y. at 185 (proceeds of a forged mortgage used as repayment for converted funds); *Southwick*, 84 N.Y. at 421 (drawn funds used, "with the assent of the drawers," to pay the balance on an overdrawn account); *White*, 64 N.Y. at 317 (payor bank intentionally paid payee bank the amount of a forged draft); *Smith & McCrorken*, 267 N.Y.S. at 154–55 (bank intentionally paid out a check that it was previously ordered not to pay); *New York Title & Mortgage Company*, 201 N.Y.S. at 530–31 (creditor intentionally paid off debtor's debt under a

mistake of fact); *Stokos*, 317 N.Y.S.2d at 707 (insurance company paid for auto repairs under the mistaken belief that it has an obligation to cover the repairs).

It therefore appears to me that the discharge for value rule has no application to the payment made in this case – an accidental payment made without intent to pay, without intent to discharge a debt or lien, and without mistake as to the transferor's duties or interests.

Resolution of this question is of course unnecessary to deciding this case. I include the discussion in case it may be helpful in the analysis of future similar disputes.

**B. The Time Taken to Produce this Judgment.**

This judgment has taken a long time to produce. I take sole responsibility for that. Judge Park's complaint on that ground has some merit. I truly regret that I did not get the job done faster. That issue, nonetheless, calls for some discussion. The delay resulted in part from our making a change of disposition. Judge Sack and I originally determined to certify the question to the New York Court of Appeals. I

wrote a draft opinion to that effect. We then decided against certification -- primarily because certification ordinarily results in at least a year's further delay and because we became increasingly persuaded, despite initial uncertainties, that the law of New York, for the reasons explained above, favors Citibank's position.

In addition, we have not found the answers to be as straightforward, obvious, and easy as Judge Park does. The arguments advanced for the parties by their exceptionally able counsel, raise complex, subtle questions that required care and study. The district court's impressive 101-page ruling in favor of the Defendants also required confrontation of numerous substantial arguments. The solutions advocated by Judge Park were not advanced by Citibank or debated in the parties' briefing. Nor, in my view, do they reflect the law of New York.

A decision of a court of appeals must satisfy two requirements, which pull it in different directions. It should, as rapidly as reasonably possible, tell the parties who wins. At the same time, recognition that the decision serves as precedential law requires that it rest on, and clearly

explain, sound legal principles. In a money dispute, the parties ordinarily care little for the precedential effect of the decision; their interest is to get a rapid answer to who gets the money. A court, however, must pay careful attention to the decision's precedential function. This is because unavoidably the decision will affect the resolution of future disputes and influence public behavior and business planning. A decision of a precedential court that rests on unsound, poorly reasoned, or poorly explained, legal principles will therefore cause great future mischief. Finding the best accommodation between the objectives of speed and legal soundness is not always easy.

PARK, *Circuit Judge*, concurring in the judgment:

When people receive money by mistake, the law usually requires them to give it back. This commonsense rule allows transferors to reclaim property that rightfully belongs to them—whether misdirected funds,[1] an accidental overpayment,[2] or a credit to the wrong bank account.[3] An exception to the general rule can sometimes protect a recipient who was owed the mistakenly paid money. Under this narrow equitable defense, called "discharge for value," a creditor who receives a payment in discharge of a debt he is owed can defeat restitution by invoking his own competing claim to the disputed funds. But here, Defendants had no such claim—not when they received Citibank's money, and not when they were asked to give it back—because they were not entitled to payment for another three years after Citibank erroneously sent them half a billion dollars. Allowing them to keep that money would turn equity on its head and topple the settled expectations of participants in the multitrillion-dollar corporate-debt market. It would also be brutally unfair.

---

[1] *E.g.*, *Home Sav. Bank v. Rolando*, 14 A.2d 822, 824 (R.I. 1940) (sum of money paid by a bank to the executor of the late Francisco Marsicano was erroneously drawn from an account that "in fact . . . belonged to another man by the name of Francisco Marsicano").

[2] *E.g.*, *PaineWebber, Inc. v. Levy*, 680 A.2d 798, 798–800 (N.J. Super. Ct. Law Div. 1995) (seller of stock received proceeds for 100 times his number of shares due to an unprocessed reverse stock split).

[3] *E.g.*, *Citibank, N.A. v. Warner*, 449 N.Y.S.2d 822, 823 (Sup. Ct. 1981) ("[T]he bank inadvertently microencoded the defendant's account number 010 22666 thereon, instead of the account number of the [intended recipient] 109 22666.").

In my view, this is a straightforward case that many smart people have grossly overcomplicated and that we should have decided many months ago. The Court ultimately arrives at the correct conclusion but only after taking an unnecessary detour through the factual record. I agree with the majority that the district court clearly erred in concluding that there were insufficient red flags to put Defendants on notice of Citibank's mistake. I also agree that the district court erred as a matter of law in its overreading of *Banque Worms*. But Defendants' case fails on a more basic level: A recipient of mistakenly transferred funds cannot invoke the discharge-for-value defense—a general legal rule incorporated by the *Restatement (First) of Restitution* and the New York Court of Appeals—unless and until it has a present entitlement against the debtor. Put simply, you don't get to keep money sent to you by mistake unless you're entitled to it anyway. I respectfully concur only in the judgment.

## I. BACKGROUND

On August 11, 2020, Citibank set out to process a $7.8 million interest payment to the lenders of its client Revlon, Inc., a global cosmetics company. But instead, Citibank inadvertently wired the entire principal balance of the loan—nearly $1 billion—from the bank's own account. Some recipients gave the funds back. Defendants ("the Creditors"), managers who controlled over $500 million of the mistakenly transferred funds, did not. Citibank sued, lost at a bench trial, and appealed to this Court.

A. Revlon's Debt Dispute

In 2016, Revlon took out a $1.8 billion loan (the "2016 Term Loan") to finance its purchase of Elizabeth Arden, Inc., another cosmetics brand. A syndicate of lenders agreed (under the "2016

2

Term Loan Agreement") to provide the funds in exchange for periodic interest payments and a return of principal on September 7, 2023, the maturity date. Revlon offered certain intellectual property ("IP") as collateral.

In addition to Revlon and the lenders, Citibank was party to the contract as the "Administrative Agent and Collateral Agent." In that role, Citibank was charged with receiving interest and principal payments from Revlon and passing them along to the lenders. Those lenders—investors and investment vehicles that took a variety of corporate forms—were represented by portfolio managers, including Defendants, who controlled the lenders' funds.

By spring 2020, liquidity had become tight for Revlon in the face of slumping sales numbers and the beginning of the COVID-19 pandemic. Revlon tried to raise additional capital to meet its immediate financial obligations, and it again sought to put up its IP as collateral. But to do so, it had to win majority approval of the 2016 Term Loan lenders, whose loans were secured by the same property. So Revlon proposed a "roll-up" transaction: A lender who agreed to the refinancing would convert its 2016 Term Loan position into a new one in the 2020 loan. The consenting creditors would thus continue to have their loans secured by Revlon's IP, while those maintaining their 2016 positions would effectively lose their priority.

Not all agreed. The objecting lenders—Defendants here among them—campaigned to block the deal, fearing that the restructuring would leave them holding the bag in the event of a default if others acceded to Revlon's plan and they did not. But ultimately, Revlon prevailed, and the IP transfer took place in May 2020. Afterwards, some objectors, including Defendants, accused

Revlon of manipulating the vote. In an effort to accelerate the debt's maturity and to demand repayment immediately, they planned a lawsuit in which they would allege that Revlon was "deeply insolvent." Joint App'x at 177. By then, the value of the 2016 Term Loan had fallen to roughly 25 to 30 cents on the dollar. The Creditors' lawsuit, naming Revlon and Citibank as defendants, was eventually filed on August 12, 2020, at 2:06pm.

B.     The Mistake

Just one day before then, however, the Creditors were suddenly repaid in full. Notwithstanding Revlon's dire financial straits, its reputation for playing leveraged-finance hardball, [4] and the impending lawsuit alleging its chronic insolvency, each creditor on the 2016 Term Loan received, without notice or explanation, every penny of its principal and interest balance three years early, for a total of $893,944,008.52 in prepaid principal.

Of course, Revlon had *not* suddenly acquired the cash, or the irrational impulse, to prepay all of its outstanding debt to the 2016 creditors at four times its market value. Instead, Citibank had paid off the balances by mistake.

That day, August 11, 2020, Citibank was tasked with executing a roll-up for a few of the 2016 lenders. This required Citibank (1) to pay accrued interest to those lenders, and (2) to move their principal balance to a new loan facility. Under the constraints of Citibank's

---

[4] Revlon was at the time 85% owned by Ronald Perelman's MacAndrews & Forbes Inc., whose own battle to take over Revlon is one of the most famous corporate-control fights in modern history. *See Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986).

4

"Flexcube" payments software, the best way to do that was apparently to pay *all* of the 2016 lenders their accrued interest. Then, Citibank would synthetically pay all those lenders their principal by routing it into a "wash account," from which the principal could be reallocated into the old and new tranches of loans.

Revlon agreed to pay accrued interest to all of the 2016 lenders in this way, and Citibank delegated execution to an employee at its contractor in India. In order to pay out interest but redirect the principal into a wash account, that employee had to check three cryptically named boxes in Flexcube: "FRONT," "FUND," and "PRINCIPAL." But the employee checked only "PRINCIPAL," and neither of the two supervisors charged with verifying the transaction spotted the error. So, instead of booking a wash transfer, Flexcube *actually* wired nearly $1 billion of Citibank's own money out the door to the 2016 Term Lenders.

The lenders each received a "Calculation Statement" showing only a payoff of accrued interest. The dollar amounts they were wired, however, were over 100 times larger. Per the 2016 Term Loan Agreement, Revlon was permitted to prepay the loan, but it had to give notice to Citibank three days in advance, and Citibank then had to notify the lenders of the decision "promptly." No lender received notice that Revlon was prepaying any debt.

C.    The Aftermath

The day after the transfer, on August 12, at around 2:25pm, Citibank began sending "Recall Notices" to the lenders notifying them of the mistake. Managers controlling about half of the total sum quickly agreed to return the mistakenly wired funds. Defendants decided not to do so.

5

First came mockery.    From one pair of employees:

[Employee A]:    I feel really bad for the person that fat fingered a $900mm erroneous payment.    Not a great career move

. . . .

[Employee B]:    certainly looks like they'll be looking for new people for their Ops group

[Employee A]:    How was work today honey?    It was ok, except I accidentally sent $900mm out to people who weren't supposed to have it

[Employee A]:    Downside of work from home. maybe the dog hit the keyboard

[Employee B]:    the song "Had a Bad Day" playing in the background

Spec. App'x at 73.

Then came strategy.    After receiving the Recall Notices, the Creditors paused.    There were calls and emails with counsel.    There were sudden reversals, instructions to stop payment.    *See, e.g.*, Joint App'x at 1302–03 ("Sounds like we have a good bargaining chip with Citi/revlon"; "Do not refund [the payment], I am on a call with attorneys right now.").    And then, a few months later, there was voluntary dismissal of the Creditors' earlier lawsuit against Revlon. After all, the Creditors already had more than what they wanted: They could, as one employee put it, "take the money and run."    *Id.* at 1295.

6

Less than a week after the error, on August 17, 2020, Citibank sued under theories of unjust enrichment, conversion, money had and received, and payment by mistake. Citibank sought equitable relief in the form of specific restitution of its identifiable funds.[5] The United States District Court for the Southern District of New York granted a temporary restraining order freezing the funds,[6] but after a bench trial, the district court entered judgment for Defendants and held that recovery was barred by the discharge-for-value defense. *In re Citibank Aug. 11, 2020 Wire Transfers*, 520 F. Supp. 3d 390 (S.D.N.Y. 2021). Citibank appealed, arguing the defense does not apply for three reasons: (1) Defendants were not yet entitled to payment, (2) Defendants did not apply the funds to credit Revlon's account before receiving the Recall Notices, and (3) Defendants were on constructive notice of the mistake even before those Recall Notices were issued.

## II.  MERITS

Mistaken payments generally must be returned to the payor. *See Ball v. Shepard*, 95 N.E. 719, 721 (N.Y. 1911); *Moses v. Macferlan* (1760) 97 Eng. Rep. 676, 680-81; 2 Burr. 1005, 1012 ("This kind of equitable action, to recover back money, which ought not in justice to

_____

[5] Remedies for unjust enrichment are available both at law (typically money damages) and at equity (typically specific enforcement of a constructive trust). *See* Restatement (First) of Restitution § 160 cmt. e. Citibank justifies its request for equitable relief in part based on the organizational structure of the lenders and managers, which Citibank says would make it difficult to trace and collect an unsecured money judgment. *Cf.* John Morley, *The Separation of Funds and Managers: A Theory of Investment Fund Structure and Regulation*, 123 Yale L.J. 1228, 1240–41 (2014).

[6] The funds remained frozen pending our review and continue to be frozen under the injunction this Court enters today.

be kept . . . lies for money paid by mistake."). The logic of this rule, a fundamental part of the law of unjust enrichment, is obvious: People do not lose all rights to their property merely because they mistakenly gave possession of it to someone else.[7]

Citibank erroneously sent a billion dollars from its own account to the creditors of Revlon three years before they were entitled to payment. Citibank thus has an unquestionable claim to entitlement under the law of unjust enrichment. *See* 3 George E. Palmer, *Law of Restitution* § 14.1(a), at 173 (3d ed. 2020) ("[U]njust enrichment in one of its clearest forms" exists when "because of plaintiff's mistake, the defendant received a money payment to which he was not entitled, and his claim for its retention rests primarily on the fact that he has it, or at least that he received it from the plaintiff."). Defendants argue that they are nevertheless entitled to keep the funds erroneously transferred by Citibank based on the discharge-for-value defense, as recognized by section 14 of the *Restatement (First) of Restitution*. *See Banque Worms v. BankAmerica Int'l*, 570 N.E.2d 189, 198 (N.Y. 1991). They clearly are not.

The majority correctly vacates the judgment of the district court but only after conducting a detailed survey of the record and New York caselaw on discharge for value. I do not disagree with that

---

[7] For the preservation of property rights, see Restatement (First) of Restitution § 163 ("Where the owner of property transfers it as a result of a mistake of such a character that he is entitled to restitution, the transferee holds the property upon a constructive trust for him."). *Accord* Restatement (Third) of Restitution § 1 cmt. b (explaining that transactions that result in "[u]njustified enrichment . . . [are] ineffective to work a conclusive alteration in ownership rights.").

analysis but would have reached the same result more directly by applying basic principles of unjust enrichment as explained below.

A.    Background Principles

The majority opinion might leave the impression that the discharge-for-value defense was first conceived of by the American Law Institute in the 1930s and then brought into existence by the New York Court of Appeals in 1991.   The majority treats the discharge-for-value rule as an espousal of "New York's general rule that mistaken payments should be returned."   Maj. Op. at 94.   But in fact, the discharge-for-value defense, as defined by the *Restatement* and then recognized in *Banque Worms*, is merely a "specific application" of a traditional equitable defense: "the principle of bona fide purchase."   Restatement (First) of Restitution § 14 cmt. a.

1.    *Bona Fide Purchase*

The bona fide purchase defense protects a party who "innocently has acquired the title to something for which he has paid value."   *Id.* § 13 cmt. a.   "Without notice of the circumstances" that would have given rise to a restitution claim against the seller, such a purchaser is insulated from restitution claims arising out of property purchased for value in good faith.   *Id.* § 13(a) (cleaned up).   That is, if *B* would owe *A* restitution over *X*, but *C*, without notice, gives value to *B* in exchange for legal title to *X*, then *A* cannot claim restitution from *C*.   The buyer *C* is "protected, as well at law, as in equity, in [his] purchase[] . . . since it would be impossible for him to guard himself against such latent frauds."   1 Joseph Story, *Commentaries on Equity Jurisprudence* § 381, at 373 (1836); *see also Simpson v. Del Hoyo*, 94 N.Y. 189, 193–94 (1883); 3 John Norton Pomeroy, *Equity Jurisprudence* § 738, at 8 (5th ed. 1941) ("[E]quity refuses to interfere

9

and to aid the plaintiff in what he is seeking to obtain, because it would be unconscientious and inequitable to do so.").

Importantly, the bona fide purchase rule is distinct from the alternative defense of mistake of fact or detrimental reliance. That defense may "terminate[] or diminish[]" the "right of a person to restitution from another because of a benefit received because of mistake" through a "[c]hange of circumstances." Restatement (First) of Restitution § 69(1)–(2). That is, if a recipient reasonably relies on a mistaken transfer to his detriment, he may be able to block recovery to the extent of his justified reliance. But the good-faith purchaser need not show any special change in circumstances. He has done more than merely detrimentally *rely* on a mistake; he has given *value* for a property interest, which protects the buyer not only in his reliance, but in his justified expectations, and so fully insulates him from any restitution claims that were viable against the seller. *See* Henry E. Smith, *Equity as Meta-Law*, 130 Yale L.J. 1050, 1095 (2021) (explaining that giving value is said to make the bona fide purchaser "equity's darling" but that "lack of value given means no reliance (or change of position)").

2.    *Discharge for Value*

Discharge for value is a "specific application" of the bona fide purchase rule. Restatement (First) of Restitution § 14 cmt. a. But a discharge-for-value creditor is both the purchaser *and* the party who would otherwise owe restitution, rather than a third party buying from one who owed restitution to another.

The defense works like this: A creditor has a claim against a debtor for unpaid debt, and a third party mistakenly sends money to the creditor on behalf of the debtor. For example, the third party

might mistakenly believe it is under a duty to do so,[8] or it might simply have made a clerical error.[9] As a result, the sender may have an unjust-enrichment claim against the creditor. *See supra* at 8-10.[10] And if that were the end of the matter, the creditor would not be able to defeat this claim through the defense of bona fide purchase because he is the original recipient, not a subsequent purchaser. *See* 3 Palmer § 16.6(b), at 590 ("When relief depends merely upon a setting aside of the payment itself, or upon rescinding an agreement pursuant to which the payment was made, the usual rules governing restitution will apply.").

The way to square bona fide purchase with discharge for value is the right of setoff. "The right of setoff . . . allows entities that owe

---

[8] *E.g.*, Restatement (First) of Restitution § 14 illus. 5 ("A, under the erroneous belief that he has effectively promised B to pay C's debt to him, makes payment thereof to B. He is not entitled to restitution from B."). Judge Leval offers a discussion about the nature of mistake under the discharge-for-value defense. *See* "Addendum" (Leval, *J.*) at 95-99. I am doubtful that the inquiry he proposes, which would seem to turn on the mental states of people making accidental payments, would be as straightforward as he believes. But in any event, as Judge Leval acknowledges, "[r]esolution of this question is of course unnecessary to deciding this case." *Id.* at 99.

[9] *E.g.*, *Banque Worms v. BankAmerica Int'l*, 570 N.E.2d 189 (N.Y. 1991).

[10] Much of this analysis would apply if the debtor (rather than a third party) were to erroneously pay the creditor directly. But in such a case, there would likely be no unjust enrichment as between the two parties: If the debtor pays a creditor a debt that is due, then the debtor is out what he owes, and the creditor receives only what she is due. *See* 3 Palmer § 14.1(a), at 173 & n.20. The *Restatement*'s discharge-for-value rule, which concerns claims between a mistaken third-party payor and a creditor, presumes the prima facie availability of an unjust-enrichment claim.

11

each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18 (1995) (quoting *Studley v. Boylston Nat'l Bank*, 229 U.S. 523, 528 (1913)); *see Off. Comm. of Unsecured Creditors v. Mfrs. & Traders Tr. Co.* (*In re Bennett Funding Grp., Inc.*), 146 F.3d 136, 138–39 (2d Cir. 1998) (New York law). Thus, a creditor—usually a bank—in possession of funds in the account of the debtor may apply (or "set off") the debtor's funds against a claim for unpaid debt. *See, e.g.*, *Marine Midland Bank-N.Y. v. Graybar Elec. Co.*, 363 N.E.2d 1139, 1142–43 (N.Y. 1977). In the case of discharge for value, a creditor sets off funds that were sent by a third party for the account of the debtor and on the debtor's behalf. *See* Brief for Amicus Curiae Loan Syndications and Trading Association in Support of Plaintiff-Appellant and Reversal at 11–12 (highlighting the parallel between setoff and discharge for value); *cf. In re Awal Bank, BSC*, 455 B.R. 73, 93 (Bankr. S.D.N.Y. 2011) (sustaining a claim over the discharge-for-value defense because plaintiff plausibly alleged notice before setoff).

Through setoff, the creditor gives value by applying mistakenly transferred funds to discharge an unpaid debt, thus taking title to the funds in exchange for surrendering a valuable claim against the debtor. Once that happens, "it would be inequitable to require restitution from the transferee since, in the surrender of the debt . . . he has given value and acquired title to the money or other thing given in payment." Restatement (First) of Restitution § 14 cmt. b; *see also id.* § 13 cmt. a ("The principle that a person who innocently has acquired the title to something for which he has paid value is under no duty to restore it to one who would be entitled to reclaim it if the one receiving it had not been innocent or had not obtained the

12

title or had not paid value therefor . . . [is] [t]he same underlying principle [operating] under the circumstances stated in § 14."); Restatement (Third) of Restitution and Unjust Enrichment § 67 cmt. a ("The thought behind the expression 'discharge for value' is that the protected recipient of a payment is treated as a bona fide purchaser of the money, to the extent the payee gives value by accepting the payment in discharge of an antecedent debt.").[11]   In other words, whereas the mistaken payment standing alone was subject to restitution, setoff allows a creditor to assume the role of bona fide purchaser—by giving "value" (in the form of relinquishing its claim for debt) in exchange for funds received and applied in "discharge" (or satisfaction) of a debt.

In short, equity protects the secured expectations of creditors who have, without notice of a mistake, given value for the funds in their possession.[12]   As Section 14 of the *Restatement* states:

---

[11] The *Third Restatement* articulates a different defense called "bona fide payee," which is broader than the discharge-for-value defense. Restatement (Third) of Restitution § 67; *see id.* § 67 cmt. a.   It is thus not dispositive of the scope of the discharge-for-value defense, *see infra* note 21, but its characterization of the traditional rule remains persuasive.

[12] One can question whether even this is enough to bring a creditor under the bona fide purchase rule.   In a typical bona fide purchase, a third-party purchaser gives value to a recipient of the property and is usually a stranger to the original owner.   Here, the creditor *is* the direct recipient and gives value to the original owner.   *See* Restatement (First) of Restitution § 13; *see also* 3 Palmer § 16.5, at 575 (further noting that, in other contexts, forgiveness of an antecedent debt may not be value); 3 Pomeroy § 748, at 26 (same).   Indeed, not all jurisdictions appear to accept the rule, instead allowing for restitution in cases where Section 14 would bar recovery.   *See Wilson v. Newman*, 617 N.W.2d 318, 321 (Mich. 2000).   But

13

A creditor of another or one having a lien on another's property who has received from a third person any benefit *in discharge of the debt* or lien, is under no duty to make restitution therefor, although the discharge was given by mistake of the transferor as to his interests or duties, if the transferee made no misrepresentation and *did not have notice of the transferor's mistake.*

Restatement (First) of Restitution § 14(1) (emphasis added).

B.    The Present-Entitlement Requirement

As a form of bona fide purchase, the discharge-for-value defense (1) requires a creditor to give "value" by setting off mistakenly transferred funds against a debt, and (2) rests on the premise that it would be inequitable to deprive a creditor of a payment he fairly bargained for.    Both these features of discharge for value lead to the same conclusion: Discharge for value requires a preexisting entitlement to mistakenly transferred funds.[13]    In *Banque Worms*, the New York Court of Appeals correctly described the *Restatement* rule it adopted when it said—without equivocation—that

---

in *Banque Worms*, the New York Court of Appeals held that New York follows the discharge-for-value rule, and no party has suggested that it no longer controls.

[13] The majority opinion eventually reaches this conclusion in Section I.B.  *See* Maj. Op. at 82.   In my view, the Creditors' lack of entitlement to the principal balance of the loan on August 11, 2020 is a sufficient basis to reverse the district court.   Even so, I diverge from the majority's approach to the present-entitlement requirement.  The majority engages in a close reading of caselaw on present entitlement and balances various policy considerations.   But, as described here, the present-entitlement requirement is rooted in equity, not caselaw.

14

the defense protects only a creditor who is "entitled to the funds" he receives.    570 N.E. at 198.

1.    *Discharge, Value, and Setoff*

Discharge for value requires giving value for mistakenly transferred funds in the form of relinquishing a debt.    But here, the Creditors could not exercise setoff rights against Revlon's debt because that debt was not yet due.

"There is . . . no question that New York has long recognized a common law right of setoff."    *In re Bennett Funding Grp.*, 146 F.3d at 139 (citing *Straus v. Tradesmen's Nat'l Bank*, 25 N.E. 372, 372 (N.Y. 1890)).    And the first rule of common-law setoff is that, absent special circumstances,[14] a debt cannot be set off against unless the debt is "due and payable" because only then can it be "presently enforced." *De Camp v. Thomson*, 54 N.E. 11, 12 (N.Y. 1899).    Thus, a creditor cannot unilaterally cleanse a payment of its mistaken character through setoff—and so take a transferor's money free of the payor's restitution claims—unless he has the power to apply the funds to satisfy a debt because that debt is already due.[15]

_____

[14] *See* N.Y. Debt. & Cred. Law § 151; *Jordan v. Nat'l Shoe & Leather Bank of N.Y.*, 74 N.Y. 467, 473 (1878).

[15] Defendants argue that a creditor gives value immediately upon payment by the debtor, without any further action by the creditor.    *See M'Crea v. Purmort*, 16 Wend. 460, 474 (N.Y. 1836) ("The payment of the money discharges or extinguishes the debt; a receipt for the payment does not pay the debt, it is only evidence that it has been paid."); *see also* 3 Palmer § 16.6, at 580 ("[R]eceipt of the plaintiff's funds in payment of . . . the debt of a third person is value."); *cf. Pittsburgh Nat'l Bank v. United States*, 657 F.2d 36, 38 (3d Cir. 1981) (Under Pennsylvania law, "as soon as a debt owed to a

15

For a matured debt, discharge for value tracks ordinary setoff principles. If the mistakenly transferred funds were already in the creditor's possession in the account of the debtor, the creditor would be entitled simply to collect. But the "self-help remedy in the form of a setoff[] cannot be exercised until . . . the obligation is due an[d] payable." *Marine Midland Bank-N.Y.*, 363 N.E.2d at 1143. That maturity condition is essential because without it, a pledge to offer credit for a defined term would be meaningless—a bank could, for example, seize a customer's deposits to offset them against her new 30-year home mortgage loan. So when a creditor holds an *unmatured* debt, it cannot apply the debtor's funds to satisfy an unripe claim, even if those funds are already legitimately and unmistakenly in the creditor's possession. It would make no sense for a creditor

bank by a depositor matures, the bank's right of setoff extinguishes the depositor's rights in the account."). Citibank contends that giving value within the scope of the defense instead requires the creditor affirmatively to set off the debt by crediting the debtor's account. *See NBase Commc'ns, Inc. v. Am. Nat'l Bank & Tr. Co. of Chi.*, 8 F. Supp. 2d 1071, 1077 (N.D. Ill. 1998); *First Nat'l Bank & Tr. Co. v. Brant (In re Calumet Farm, Inc.)*, 398 F.3d 555, 559–60 (6th Cir. 2005); *Qatar Nat'l Bank v. Winmar, Inc.*, 650 F. Supp. 2d 1, 10 (D.D.C. 2009) (mem.); *see also Equilease Corp. v. Hentz*, 634 F.2d 850, 853 (5th Cir. Jan. 1981) ("It is patently unfair to require an innocent payee who has received *and used* the money to satisfy a debt to repay the money." (emphasis added)); *cf. Strumpf*, 516 U.S. at 19 (noting the majority setoff rule requiring "(i) a decision to effectuate a setoff, (ii) some action accomplishing the setoff, and (iii) a recording of the setoff" (citing *Baker v. Nat'l City Bank of Cleveland*, 511 F.2d 1016, 1018 (6th Cir. 1975))). We need not decide which rule applies. It does not matter whether the value in discharge for value is given by force of law upon receipt and maturity or via an affirmative action of the creditor because a creditor must at least be *capable* of setting off a debt (and thus giving value) using the funds that have mistakenly come into its possession. Before maturity, a creditor cannot do so and, in any event, has received a pure windfall.

suddenly to gain that right if, rather than holding the debtor's assets already, the creditor were instead to receive a payment made by mistake. In other words, a creditor may not take a third party's money, even if sent in the name of the debtor, to cover a debt that *isn't yet due*, just because the creditor will become entitled to receive that money from the debtor in the future.

Although the right of setoff can be expanded by contract, the 2016 Term Loan Agreement here unsurprisingly preserved this basic constraint. *See* Revlon, Inc., Annual Report (Form 10-K) exhibit 4.6 (Mar. 3, 2022) (2016 Term Loan Agreement § 10.7(b)) (allowing Revlon's lenders to "set off" funds "held or owing by such [l]ender . . . to or for the credit or the account of [Revlon]," but only "upon any amount becoming *due and payable*" by Revlon (emphasis added)). Neither the general common-law right of setoff nor the specific contractual right here could be exercised because Revlon's debt was not due.

Without setoff, a creditor on an unmatured debt is not a "bona fide purchaser of the money." Restatement (Third) of Restitution § 67 cmt. a (citing Restatement (First) of Restitution § 14)). So the ordinary rule of restitution applies.

2.   *The Creditors' Windfall*

Defendants' argument also fails for a related, more basic reason: The Creditors received a massive windfall by being paid in full three years early. As the majority recognizes, "[a]pplication of the discharge-for-value rule to our facts [would] bring[] the Lenders a huge windfall over and above what they bargained for." Maj. Op. at 90. The bona fide purchaser is protected because it would be unjust and inequitable to claw back property from one who

17

innocently gave value for it. The defense does not apply to a recipient who received a pure windfall—for example, a donee who received the subject property for free. *See Simonds v. Simonds*, 380 N.E.2d 189, 194 (N.Y. 1978); *Oliver v. Piatt*, 44 U.S. 333, 401 (1845) (Story, *J.*) (emphasizing the "full right to follow such property into the hands of such third person, unless he stands in the predicament of a *bona fide* purchaser, for a valuable consideration, without notice"); J.B. Ames, *Purchase for Value Without Notice*, 1 Harv. L. Rev. 1, 3 (1887) ("If he gave no value, though his acquisition was honest, his retention of the title, after knowledge of the equity, is plainly dishonest."); *see also* Restatement (First) of Restitution § 13 cmt. a (noting that Section 14 "merely creates convenient rules for determining which of two *innocent persons should bear a loss*" (emphasis added)). Without entitlement, there would be no injustice in allowing recovery, and the discharge-for-value defense does not apply.

At a minimum, a creditor invoking the defense must have received only what he was owed. But the Creditors here received an unearned gain—and will have suffered no loss after restitution— because they were not yet entitled to be paid. To be sure, the Term Loan Agreement provided for the possibility of prepayment, but only if Revlon chose to do so. *See* Joint App'x at 1263 (2016 Term Loan Agreement § 2.11(a)) ("[Revlon] *may* at any time and from time to time prepay," under certain conditions, any tranche of its loans. (emphasis added)). By definition, prepayment is an option of the debtor, not a right of the creditor. *See Prepayment Clause*, Black's Law Dictionary (11th ed. 2019) ("A loan-document provision that *permits* a borrower to satisfy a debt before its due date." (emphasis added)).

The Creditors could not demand payment until 2023, and they were not entitled to their principal until then.[16]

It does not matter, as the Creditors suggest, that they were entitled to be paid eventually. A dollar today is not equal to a dollar tomorrow. *See generally* Irving Fisher, *The Theory of Interest* (1930). That is why debt contracts include detailed terms about the timing of payments, and why repayment timing invariably affects other elements of the bargain including the amount of interest, covenants made by the debtor, and the like. The Creditors' argument—that there is no "time" in "entitlement"—defies the basic premise of debt contracts, whose function is to exchange the time value of money: A debtor becomes entitled to cash now; a creditor, to money plus interest on a future date.

The windfall the Creditors received here is hard to overstate. On August 11, 2020, the Creditors were entitled to *nothing.* Moreover, they had just lost a bitter dispute with Revlon, held loans that were trading for a fraction of their face value, and were on the verge of filing a suit alleging a default.[17] Then, out of the blue, they

---

[16] If Revlon had decided to prepay its debt in full, and if Citibank had provided the contractually required prepayment notice, then the debt would have become "due and payable on the date specified therein." *See* Joint App'x at 1263 (2016 Term Loan Agreement § 2.11(a)); *cf. Chase Manhattan Bank v. Burden*, 489 A.2d 494, 497 (D.C. 1985) (granting discharge for value based on the equitable right to receive discretionary transfer once that discretion is exercised). But absent such notice of prepayment, the status quo remained unchanged and the debt was not due for three years.

[17] The Creditors briefly suggest that they *were* in fact entitled to the transferred funds by reason of Revlon's default. Specifically, they say that a notice of default issued on August 12, 2020 (the day after the mistaken

19

received half a billion dollars in cash—a pure bank error in their favor.[18]   Discharge for value protects only parties who received what they bargained for.   That does not include the Creditors here.

3.   Banque Worms

In *Banque Worms v. BankAmerica International*, 928 F.2d 538 (2d Cir. 1991), we asked the New York Court of Appeals whether it follows the *Restatement*'s discharge-for-value rule.   *Id*. at 539.   The court answered that it does, and both its conclusion and its articulation of the rule were consistent with the *Restatement*— including its implied present-entitlement requirement.   *Id.*   The majority agrees that the present-entitlement requirement is "clear" in *Banque Worms* and every precedent relied on therein (a reflection of long-established principles of equity).

In *Banque Worms*, Spedley Securities (the debtor) had maintained a revolving credit agreement with Banque Worms (the

---

transfer, but—apparently purely by coincidence—just before the Recall Notices were sent) accelerated the debt and made it then due and payable. That argument, which was asserted summarily, mentioned only in a footnote, and raised for the first time on appeal, is forfeited.   *See Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998); *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 445 (2d Cir. 2001) ("[W]e have repeatedly ruled that arguments presented to us only in a footnote are not entitled to appellate consideration."); *Greene v. United States*, 13 F.3d 577, 585–86 (2d Cir. 1994).

[18] Although I would not reach the issue, I agree with the majority that the Creditors were on inquiry notice.   *See supra* at 4–6.   But I am puzzled by the majority's extensive discussion about the correct notice standard, given that the Creditors (a) do not argue that anything other than constructive notice applies, and (b) do not cite any authority defining "constructive notice" under New York law as anything other than "inquiry notice."

creditor).   Banque Worms decided not to renew the agreement and demanded payment of the outstanding debt on the due date, which was in ten days.   *Id.*   At 12:36 am on the due date, Spedley initially instructed Security Pacific (the agent) to send nearly $2 million to Banque Worms.   But three hours later, Spedley revoked that instruction and told Security Pacific to pay a different creditor instead.   *Id.* at 539–40.   Security Pacific mistakenly executed both transfers that same day, leaving Spedley's account in overdraft and Security Pacific on the hook for the mistaken transfer to Banque Worms.   Banque Worms refused to return the money, which reflected the sum that had become due just hours before the funds were transferred.   Litigation ensued, with Banque Worms and Security Pacific both asserting claims to the funds.   *Id.* at 540.

Citing Banque Worms's argument based in the bona fide purchase rule, the Court of Appeals answered that New York does indeed recognize the defense.   The Court of Appeals explained that the defense "furthers the policy goal of finality in business transactions."   *Banque Worms*, 570 N.E.2d at 196.   After citing several early cases concerning title to money, the Court of Appeals noted that the rule was also consistent with the policy goals of the newly enacted Article 4-A of the New York Uniform Commercial Code.   *Id.* at 195–97.   Elaborating on the defense that it adopted, the court explained that "[w]hen a beneficiary receives money *to which it is entitled* and has no knowledge that the money was erroneously wired . . . such a beneficiary should be able to consider the transfer of funds as a final and complete transaction, not subject to revocation."   *Id.* at 196 (emphasis added).

21

In line with the principles underlying the bona fide purchase rule, the Court of Appeals expressly held that Banque Worms was protected by the discharge-for-value rule because it was *"entitled to the funds"* it received. *Id.* at 198 (emphasis added); *see also* 82 N.Y. Jur. 2d Payment and Tender § 107 & n.4 (citing *Banque Worms* for the proposition that the discharge-for-value rule applies only for "a debt which is due"); *Credit Lyonnais N.Y. Branch v. Koval*, 745 So. 2d 837, 841 (Miss. 1999) (explaining, by reference to the "preeminent case on erroneous wire transfers" *Banque Worms*, that "the beneficiary receiving the funds transfer must be entitled to receive money in payment of a debt"); *A.I. Trade Fin., Inc. v. Petra Bank*, No. 89-cv-7987, 1997 WL 291841, at *4 (S.D.N.Y. June 2, 1997) (citing *Banque Worms* for the point that "[t]he discharge for value rule contemplates that at the time of the erroneous transfer the transferee/beneficiary have some present entitlement to the funds"); 3 Palmer § 16.6, at 580–82 ("In situations of endless variety, courts have denied restitution because money paid by one party was received in good faith by the other, *in satisfaction of . . . a valid claim* against a third person." (emphasis added)). The Creditors and the district court find ambiguity in *Banque Worms* where there is none.[19]

Of course, the facts of *Banque Worms* are very similar to those of this case. But there is one crucial difference: Unlike the Creditors here, Banque Worms was entitled to the money it mistakenly

---

[19] The majority implies that *Banque Worms* adds a present-entitlement requirement not otherwise included in Section 14. Maj. Op. at 91 ("[T]he district court is correct that Section 14 of the First Restatement does not mention a present entitlement requirement."). As Citibank correctly argues, *Banque Worms* explicitly states a requirement that the *Restatement* necessarily implies. *See* Appellant's Brief at 26.

received.    Indeed, it had just discontinued a revolving credit agreement and demanded payment, which was received on the very day it was due.    The payment thus arrived exactly as expected and exactly as owed.    *Banque Worms*, 928 F.2d at 539.    The Creditors here received the principal amounts of their loans, which were not due until 2023.    They clearly lacked entitlement under any definition of the term or reading of New York caselaw, as the majority observes.    This lack of entitlement is dispositive—Banque Worms had a preexisting right to keep the money it received; the Creditors did not.    That should be the end of the matter.

C.    <u>The Creditors' View</u>

The Creditors contend that a lender not yet owed back its money becomes entitled to be repaid early simply because a payment was made by mistake.    Under their theory, discharge for value would operate as a kind of legal alchemy, transforming far-away debt payments into cold hard cash.    The Creditors' view has no basis in law, equity, or common sense.

1.    *Textual Arguments*

Instead of addressing the legal content of the defense incorporated by the *Restatement* and then adopted in *Banque Worms*, the Creditors draw the wrong lessons from the text.    They say that Section 14 doesn't mention a present-entitlement requirement, only a "discharge" of the debt of a "creditor"; and that our Court, in interpreting the decision of the Court of Appeals in *Banque Worms*, found it important that Banque Worms was a "*bona fide* creditor." *Banque Worms*, 928 F.2d at 541.

These arguments are misguided. The "discharge" in discharge for value requires a discharge in exchange for *value*. *See supra* Section II.B.1. And in *Banque Worms*, our Court referred to Banque Worms as a "*bona fide* creditor" in passing only after explaining in detail the timeline of events and Banque Worms's entitlement to the funds. 928 F.2d at 539–40. More broadly, the Creditors' style of argument—relying on cherry-picked, isolated phrases taken out of context—is misplaced. "The language of an opinion is not always to be parsed as though we were dealing with the language of a statute." *Brown v. Davenport*, 142 S. Ct. 1510, 1528 (2022) (cleaned up) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979)). Neither the American Law Institute (in drafting the *Restatement*) nor the New York Court of Appeals (in deciding *Banque Worms*) acted as a legislature drawing up a new rule, requiring us to evaluate the meaning of statutory language. Rather, both relied on well-settled rules of law and equity, which we are bound to apply even if doing so may require more effort than reading legal text.

Here, Defendants' view—which effectively reads out "value" from "discharge for value"—is unfounded. Ordinarily, a recipient of mistakenly transferred funds must prove reasonable, detrimental reliance on the other party's mistake—and may keep transferred property only to the extent that recovery would be unjust. *See Banque Worms*, 570 N.E.2d at 192; Restatement (First) of Restitution § 69(1)–(2). Discharge for value, like the general defense of bona fide purchase, deems giving value as a substitute for a special showing of reliance. *See supra* Section II.A. There is thus an intuitive parallel between these two defenses: Mistake of fact requires detrimental reliance before a recipient is put on notice, and discharge for value similarly requires giving value before a recipient is put on notice.

The Creditors, like the district court, try to invert this principle by contending that because a discharge-for-value creditor need not show reliance, it *also* need not show value given. But bona fide purchase excuses a separate showing of reliance *because* the purchaser has given value. Simply being a creditor entitled to payment sometime in the future, without reliance or value, is irrelevant.[20]

2.    *Policy Arguments*

The Creditors also raise two unpersuasive arguments based on policy concerns. First, they assert that forbidding restitution here, even if it might result in injustice, would advance "finality." But, as the majority correctly points out, the Court of Appeals in *Banque Worms* did not express any interest in ensuring that transactions are "final," in the sense that they cannot be undone, in all cases. To the

---

[20] The Creditors claim to find support in the *Third Restatement*, which allows for retention of funds even where a creditor has "something short of an enforceable right." Restatement (Third) of Restitution § 67 cmt. c. The Creditors overread this language. *See id.* § 67 cmt. h ("The object of the rule of § 67 is not the 'finality' of payment transactions without more . . . but the security of expectations of ostensible ownership— expectations that are reasonably formed on receipt of money *to which the payee is apparently entitled*." (emphasis added)). In any event, the Court of Appeals explicitly adopted the rule of the *First Restatement*, the *Third* was published twenty years after *Banque Worms*, and the latest edition forthrightly admits that it seeks to "state[] the rule more broadly" than the *First Restatement* to cover "a wide range of transactions." *Id.* § 67 cmt. a; *see also Kansas v. Nebraska*, 574 U.S. 445, 475 (2015) (Scalia, *J.*, dissenting) (noting that "modern Restatements—such as the Restatement (Third) of Restitution . . .—are of questionable value, and must be used with caution" given the authors' increasing "abandon[ment] [of] the mission of describing the law" and their "cho[ice] instead to set forth their aspirations for what the law ought to be").

contrary, it held that "[w]hen a beneficiary receives money *to which it is entitled* and has no knowledge that the money was erroneously wired . . . such a beneficiary should be able to consider the transfer of funds *as a final and complete transaction*, not subject to revocation." *Banque Worms*, 570 N.E. at 196 (emphasis added). This holding echoes traditional equitable and commercial concerns, not a rule of "finders, keepers." If the court wanted to insist on the finality of all errant transactions, it would have had to do away altogether with the law of unjust enrichment, which provides for the unwinding of otherwise-final transfers. *See* Andrew Kull, *Rationalizing Restitution*, 83 Calif. L. Rev. 1191, 1234 (1995). An erroneous transfer by itself creates no new "final" entitlement: Discharge for value lets a creditor keep mistakenly transferred funds if it was already entitled to those funds, but it does not convert a mistake into a sudden acceleration of maturity.

Second, drawing on the reasoning of the district court, the Creditors suggest that, by penalizing transferors for their mistakes, courts might encourage them to take greater care. But to what end, and at what cost? If a transferor discovers its mistake and asks for its money back before the transferee has either relied on or given value for it, then there is no harm done—not to the transferee, and not to anyone else. All that remains is the transferor's own, internalized cost of pursuing recovery, a cost that supplies the efficient deterrent.[21]

---

[21] *See* J. Beatson & W. Bishop, *Mistaken Payments in the Law of Restitution*, 36 U. Toronto L.J. 149, 150 (1986) (Where a "mistaken payment is very quickly discovered . . . [a]ny such avoidance expenditure would be wasted—a costly attempt to avoid a costless event."); Dhammika Dharmapala & Nuno Garoupa, *The Law of Restitution for Mistaken Payments:*

The law thus allows mistaken transferors to recover even if they were negligent. *Ball*, 95 N.E. at 721.

And even if we were permitted to modify the discharge-for-value rule to achieve the policy ambitions articulated by the district court, it would be bizarre to do so here. In particular, the district court's warning that "the banking industry could—and would be wise to—eliminate the risk [of mistakes] altogether" is especially inapt in the context of what it called a "Black Swan" event.[22] *Citibank*, 520 F. Supp. 3d at 451. Denying recovery would senselessly induce loan agents to expend resources in a futile effort to prevent *all* possible mistakes, no matter how unpredictable, and no matter how

*An Economic Analysis* (manuscript at 30) (Feb. 2022), https://ssrn.com/abstract=3902607 ("[I]t is clear . . . that [full restitution] is socially optimal whenever harm is unilateral—i.e., when a mistaken payment imposes [harm] only on the payer (absent restitution)."); Maytal Gilboa & Yotam Kaplan, *The Cost of Mistakes*, 122 Colum. L. Rev. F. 61, 67 (2022) ("[A]s long as the mistake is harmless, restitution should be available to protect the payer."); Peter K. Huber, *Mistaken Transfers and Profitable Infringement on Property Rights: An Economic Analysis*, 49 La. L. Rev. 71, 83 (1988) ("[A]s long as the recipient has not disposed of the money, he generally suffers no loss if he has to turn it over to the transferor-claimant.").

[22] Indeed, the entire point of the "Black Swan" framework that the district court invoked is that predicting extreme events is an impossible, counterproductive task. *See* Nassim Nicholas Taleb, *The Black Swan: The Impact of the Highly Improbable* 208 (2d ed. 2010) ("[D]o not try to predict precise Black Swans . . . . Remember that infinite vigilance is just not possible."). Instead, the theory goes, systems should be "robust" in that they can flexibly respond to errors when they inevitably occur. *Id.* at 322. For example, perhaps rather than imposing on banks a duty to prevent all possible errors, the law might allow them to recover mistakenly transferred funds when a transferee has neither relied on nor given value for them.

harmless. It should come as no surprise that the opinion below has roiled the market for commercial debt, to the point where the type of contract clause overriding the district court's rule already has its own name: "Revlon blocker." *See* Brief of Professors of Law and Economics as Amici Curiae at 27; Eric Talley, *Discharging the Discharge-for-Value Defense*, 18 N.Y.U. J.L. & Bus. 147, 154 (2021) (reporting a "veritable flood" of 150–200 such Revlon blockers *per month* following the decision, compared to exactly one contract affirmatively adopting the district court's rule).

### III. CONCLUSION

Although the majority has ultimately arrived at the correct conclusion, its delay in having done so is unfortunate. Citibank filed suit within six days of its mistake, the district court conducted a full bench trial and published a detailed opinion six months later, and we—at least nominally—expedited consideration of this case. But it has now been nearly a year since oral argument and over two years since the mistaken transfer.[23] In that time, Citibank has lost of tens of millions of dollars in interest alone on its frozen funds. Businesses and their lenders have scrambled to negotiate various new terms into their agreements. *See* Talley, *supra*, at 199–200. And the parties, as

---

[23] At oral argument, it was suggested that we might be amenable to certifying questions to the New York Court of Appeals. Thankfully, no one defends that path—and the months or years of additional litigation it could entail—today. In fact, even the party that floated the possibility of certification has since written to the Court that, in light of intervening events, *see infra* at 29–30, the parties would instead "benefit from a prompt resolution of this appeal." Appellant's Rule 28(j) Letter at 1 (June 22, 2022).

well as the market at large, have had to manage the uncertainty our indecision has caused them.

This delay has had dire repercussions for Revlon, the company at the center of this case. Both sides contend that through subrogation, the district court's judgment has put Citibank in the shoes of the Creditors, obliging Revlon to pay Citibank instead and transferring to Citibank the credit risk of Revlon's distressed debt. A company like Revlon—no stranger to restructuring its debts—would normally try to negotiate with its creditors when struggling to meet its obligations. But Revlon never recognized Citibank's subrogation claim, [24] and even if it had, Citibank would have been at best a substitute creditor, whose claim (if any) would revert to Defendants once Citibank finally reclaimed its funds. Revlon cannot secure additional senior financing without the consent of a majority of the 2016 Term Creditors, but for the past two years, no one has been able to agree on who would constitute such a majority. So Revlon "effectively has had, since August 11, 2020, no 2016 Term Loan[] counterparty with which it can negotiate," and on June 15, 2022, Revlon filed for Chapter 11 bankruptcy. Declaration of Robert M. Caruso, Chief Restructuring Officer at 7, *In re Revlon, Inc.*, No. 22-10760 (Bankr. S.D.N.Y. June 16, 2022), ECF No. 30. Revlon, a century-old American company, cited not just its business troubles, but also "significant and unprecedented difficulty in managing its capital structure out of court." *Id.* at 37. That difficulty, Revlon

---

[24] *See* Revlon, Inc., Quarterly Report (Form 10-Q), at 33 (May 4, 2022) ("Citi has also asserted subrogation rights, but, as yet, there has been no determination of those rights (if any) under the 2016 [Term Loan] and Revlon has not taken a position on this issue.").

said, stemmed from the fact that "the Second Circuit ha[d] not yet issued a decision" in this case. *Id.*

Respectfully, I would not have waited so long to reach a conclusion that was clear from the start. At bottom, Defendants received a payment to which they were not entitled, for which they did not bargain, and on which they did not rely. Their only real asserted justification for keeping Citibank's money is "finality"—the fact that they have it. But that is not enough to claim ownership over someone else's property. Possession is not ten-tenths of the law.

I join only in the majority's judgment.